No. 21-3345

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LORENZO JOHNSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
For the Northern District of Indiana,
Hammond Division.
No. 2:20-CR-007-PPS-JEM
The Honorable Philip P. Simon, Judge.

_____

APPELLANT'S BRIEF AND REQUIRED APPENDIX

_____

Jeremiah R. Newhall
*Attorney for Defendant-Appellant*
Newhall Law Firm
2024 W. Henrietta Road, Suite 2-A
Rochester, NY 14623
(202) 615-9782
Jeremiah@newhallfirm.com

Oral Argument Requested

No. 21-3345

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LORENZO JOHNSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
For the Northern District of Indiana,
Hammond Division.
No. 2:20-CR-007-PPS-JEM
The Honorable Philip P. Simon, Judge.
_____

DISCLOSURE STATEMENT

The undersigned counsel furnishes the following list in compliance
with Circuit Rule 26.1:

1.     The full name of every party or amicus the attorney represents in the
case: <u>Lorenzo Johnson.</u>

2.     The names of all law firms whose partners or associates have
appeared in the district court, or are expected to appear in this case, for
Defendant-Appellant: <u>Newhall Law Firm (present counsel), Law Office of
Adam Tavitas.</u>

3.     Mr. Johnson is not a corporation

Dated: July 12, 2022                         <u>  /s/ Jeremiah R. Newhall</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... vi

JURISDICTIONAL STATEMENT .................................................... 1

ISSUES PRESENTED FOR REVIEW ............................................... 3

STATEMENT OF THE CASE ........................................................... 3

    I.   Factual Background and Indictments ................................... 4

    II.  Mr. Johnson's Timely Request For New Counsel A Year
         Before Trial.......................................................................... 6

    III. Mr. Johnson's Trial Counsel Moves To Withdraw Days
         Before Trial.......................................................................... 8

    IV. The Trial ............................................................................ 10

        A.  The government's case: IP addresses, machine cookies,
            partial admissions by Mr. Johnson, and the contents of
            Mr. Johnson's phone. ..................................................... 11

        B.  The defense argument: FBI Agents C.O. and N.R. failed
            to pursue other leads, including the woman in
            Mr. Johnson's apartment, neighbors who might have
            shared his IP address, and the real "Ashley Campbell." .......... 13

    V.  The Motion for New Trial.................................................. 15

    VI. Presentence Investigation Report and Sentencing........................... 16

SUMMARY OF ARGUMENT ........................................................ 20

ARGUMENT.................................................................................. 21

    I.   The district court erred when it denied Mr. Johnson's two
        requests to replace his court-appointed counsel.............................. 21

        A.  The standard of review is abuse of discretion. ........................... 21

        B.  The district court abused its discretion by failing to
            inquire about the reasons for Mr. Johnson's first request
            for new counsel. ............................................................. 22

        C.  The district court stressed the timing of the second
            motion for new counsel, but should have given greater
            weight to Mr. Johnson's previous attempts to ask the
            court for new counsel. ..................................................... 24

    D.  Counsel and Mr. Johnson demonstrated their continued failure to communicate at the hearing. ........................................ 25

    E.  The failure to replace counsel was not harmless because trial counsel made no attempt to win the motion for a new trial. ..................................................................................... 26

    F.  Alternatively, this Court should reconsider its precedent on harmless error when a district court erroneously denies a motion to appoint new counsel. .................................... 29

        a.  The Tenth Circuit has considered and rejected this Court's approach. .................................................................... 31

        b.  When a district court errs and that error is challenged on direct appeal, the government should have the burden of proving harmlessness beyond a reasonable doubt. ....................................................................... 32

II.  The district court erred when it denied the motion for a new trial. ........................................................................................ 36

    A.  The standard of review is abuse of discretion ............................ 36

    B.  Despite the brevity of trial counsel's oral motion, the district court knew the nature of the withheld evidence and the thrust of the defense at trial. ........................................... 37

    C.  Evidence of bias would have bolstered the defense theory that the government failed to investigate other leads into "Ashley Campbell" ........................................................ 37

III.  The district court erred when it concluded that Mr. Johnson's co-defendant's suicide was caused by his offense, and relied upon that conclusion to impose sentence. ........................................ 40

    A.  The standard of review is *de novo* ................................................. 41

    B.  Mr. Johnson has a due process right to be sentenced based on reliable information proved by a preponderance of the evidence. ..................................................... 42

    C.  The district court erroneously concluded that the offense "played a role" in the suicide of Mr. Johnson's co-defendant, Ms. Gauler, without hearing any evidence from either party about Ms. Gauler's motives ........................... 43

iv

D.  Mr. Johnson lacked notice and an opportunity to present evidence to rebut the court's conclusion about Ms. Gauler's motives for suicide. .................................................. 47

CONCLUSION .................................................................................. 49

CERTIFICATE OF COMPLIANCE ................................................. 50

APPELLANT'S REQUIRED SHORT APPENDIX.......................... 51

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30..................... ii

# TABLE OF AUTHORITIES

## Cases

Chapman v. California, 386 U.S. 18, 87 S.Ct. 824 (1967) ........................................... 29

Coleman v. Alabama, 399 U.S. 1, 90 S. Ct. 1999 (1970) ........................................... 33

Ditch v. Grace, 479 F.3d 249 (3d Cir. 2007) ................................................................. 34

Martel v. Clair, 565 U.S. 648, 132 S. Ct. 1276 (2012) ................................................. 24

Peoples v. United States, 403 F.3d 844 (7th Cir. 2005) ............................................. 27

Siverson v. O'Leary, 764 F.2d 1208 (7th Cir. 1985) ................................................... 34

Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984) .............................. 35

United States v. Bagley, 473 U.S. 667, 105 S. Ct. 3375 (1985) ................................... 36

United States v. Banks, 964 F.2d 687 (7th Cir. 1992) ........................................... 42, 45

United States v. Brown, 79 F.3d 1499 (7th Cir. 1996) ......................................... 23, 24

United States v. Calderon, 127 F.3d 1314 (11th Cir.1997) ........................................ 30

United States v. Curtis, 280 F.3d 798 (7th Cir. 2002) ................................................. 36

United States v. Graham, 91 F.3d 213 (D.C.Cir.1996) ............................................... 30

United States v. Harris, 558 F.2d 366 (7th Cir. 1977) ................................................ 42

United States v. Huston, 280 F.3d 1164 (7th Cir. 2002) ............................................. 24

United States v. Jackson, 32 F.3d 1101 (7th Cir. 1994) .............................................. 47

United States v. Jackson, 983 F.2d 757 (7th Cir. 1993) .............................................. 42

United States v. Lott, 310 F.3d 1231 (10th Cir. 2002) ................................... 31, 32, 33

United States v. Lott, 433 F.3d 718 (10th Cir. 2006) ("Lott II") .............................. 32

United States v. Morales, 746 F.3d 310 (7th Cir. 2014) .............................................. 36

United States v. Morrison, 946 F.2d 484 (7th Cir. 1991) ........................................... 30

United States v. Oliver, 873 F.3d 601 (7th Cir. 2017) ................................................. 42

United States v. Owen, 407 F.3d 222 (4th Cir. 2005) ................................................. 34

United States v. Robinson, 843 F. App'x 607 (5th Cir. 2021) .............................. 43, 45

United States v. Ryals, 512 F.3d 416 (7th Cir. 2008) ............................... 21, 26, 27, 28

United States v. Ryan, 885 F.3d 449 (7th Cir. 2018) ................................................... 25

United States v. Senke, 986 F.3d 300 (3d Cir. 2021) ................................................... 31

United States v. Serhant, 740 F.2d 548 (7th Cir. 1984) ........................................ 44, 48

United States v. Sienkowski, 359 F.3d 463 (7th Cir. 2004) ........................................ 47

United States v. Wallace, 753 F.3d 671 (7th Cir. 2014) ................................. 27, 31, 32

United States v. Williams, 616 F.3d 685 (7th Cir. 2010) ........................................... 30

United States v. Wood, 31 F.4th 593 (7th Cir. 2022) ............................................ 41, 42

United States v. Zillges, 978 F.2d 369 (7th Cir. 1992) .........................................passim

Weaver v. Massachusetts, 137 S. Ct. 1899, 198 L. Ed. 2d 420 (2017) ...................... 35

Yick Man Mui v. United States, 614 F.3d 50 (2d Cir. 2010) ...................................... 27

## Statutes

18 U.S.C. § 2251 ................................................................................. 1, 5

18 U.S.C. § 2252 ................................................................................. 1, 5

18 U.S.C. § 3231 ..................................................................................... 1

18 U.S.C. § 3742 ..................................................................................... 2

18 U.S.C. § 922 ................................................................................... 1, 6

28 U.S.C. § 1291 ..................................................................................... 2

## Other Authorities

Alison Liebling, <u>Prison Suicide and Prisoner Coping</u>, 26 CRIME & JUST. 283 (1999)
.................................................................................................................. 44

Allen C. Schlinsog, Jr., <u>The Suicidal Decedent: Culpable Wrongdoer, or
Wrongfully Deceased?</u>, 24 J. MARSHALL L. REV. 463 (1991)................................ 43

# JURISDICTIONAL STATEMENT

The district court had original jurisdiction over this case pursuant to

18 U.S.C. § 3231, which provides exclusive jurisdiction over offenses

against the United States.  The government filed a criminal complaint

against Mr. Johnson (R 1) and later followed it with indictments charging

Mr. Johnson with three counts of conspiracy to produce child

pornography, in violation of 18 U.S.C. § 2251(a) and (e) (Counts 1-3); with

one count of distribution of child pornography, in violation of 18 U.S.C.

§ 2252(a)(2) and (b)(1) (Count 6); and with one count of being a felon in

possession of a dangerous weapon, in violation of 18 U.S.C. § 922(g)(1)

(Count 7).[1]  (R. 9.)[2]  A jury convicted Mr. Johnson on all counts.  (R. 101.)

On December 17, 2021, the district court sentenced Mr. Johnson to 600

---

[1] Counts 4 and 5 were brought against Mr. Johnson's co-defendant, Kelsie Gauler.
Ms. Gauler committed suicide before trial and those indictments were dismissed.
During trial, Counts 6 and 7 were referred to as Counts 4 and 5.

[2] This brief uses the following abbreviations: "R. ___" refers to the docket number in the
district court (followed by a page number where applicable); "T1 __," "T2 __, "T3 __,"
and "T4 __," refer to the Trial Day 1, 2, 3, and 4 transcripts, respectively; "PSR" refers to
the presentence investigation report used at Mr. Johnson's sentencing hearing; "FPT"
refers to the July 20, 2021 Final Pretrial Conference transcript; "SC" refers to the August
20, 2020, Status Conference transcript;  "SMH" refers to the August 10, 2021, Sealed
Motion Hearing transcript; "SH" refers to the December 17, 2021, Sentencing Hearing
transcript; "SA" refers to the Appellant's required short appendix; and "SEAL" refers to
the Appellant's sealed appendix.

months for counts 1-3, 480 months for Count 6, and 120 months for Count 7, all concurrent.  (SA 29 and 37; R. 120 at 3.)

Mr. Johnson appeals his conviction and sentence.  This court has jurisdiction over this case pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.  The district court imposed sentence and entered a written judgment on December 17, 2021.  (R. 120, SA 27-29 and 35.) Mr. Johnson made an oral motion for a new trial on December 17, 2021. (R. 119, SA 8-12.) The district court denied that motion the same day. (R. 119, SA 12.)  Mr. Johnson filed his notice of appeal on December 18, 2021. (R. 125.)

## ISSUES PRESENTED FOR REVIEW

I.    Did the district court err when it denied Mr. Johnson's motion to replace his appointed counsel?

II.   Did the district court err when it denied Mr. Johnson's motion for a new trial based upon the Government's failure to disclose impeachment evidence?

III.  Did the district court, in imposing the sentence, unreasonably conclude that Mr. Johnson's co-defendant's suicide was caused by the offense conduct?

## STATEMENT OF THE CASE

This is a direct appeal from Mr. Johnson's convictions by jury for conspiracy to create child pornography, distribution of child pornography, and being a felon in possession of a firearm. He challenges the district court's denial of his motion for new counsel, its denial of his motion for a new trial, and its procedure in finding him responsible at sentencing for the suicide of his co-defendant, Kelsie Gauler.

## I.     Factual Background and Indictments

The offense conduct in this case occurred online through Facebook, a social networking website. A user calling herself "Ashley Campbell" solicited the other co-conspirators through Facebook messages, which are similar to private texts. (T1 22-24.) "Ashley Campbell" contacted three different women—Kelsie Gauler, Jasmine Stanley and Dominique Harper—and asked them to send "Ashley Campbell" pictures of the genitals of children in their care, with promises of money. (T2 239-53 (Harper), T2 268-77 (Stanley), T2 281-88 (Gauler)) The women sent the images to "Ashley Campbell," but never received any money. (T3 311.) The government discovered the "Ashley Campbell" Facebook account after a fourth woman, Neci Taylor, reported Facebook messages from "Ashley Campbell" to the police. (T1 38-40.) A police officer then began corresponding on Facebook as Ms. Taylor. (T1 75.)

Ms. Taylor also received a message sent from a Facebook account in Lorenzo Johnson's name, telling her that "some white lady" had posted screenshots of her conversations with "Ashley Campbell." (T1 43.) The Lorenzo Johnson Facebook account sent Ms. Taylor's account images of naked children that the "Ashley Campbell" account had received from

Gauler, Stanley, and Harper. (T2 111-16.) Two other Facebook accounts,

"BigZo Johnson" (the profile photo of which was of Mr. Johnson) and

"Ashley Gauler," also contacted Ms. Harper and Ms. Taylor, respectively.

(T2 258-68 (Harper), T1 43 (Taylor).)

After obtaining a search warrant based on data from Internet

providers such as Facebook and AT&T, federal agents and police searched

Mr. Johnson's home. (T3 301-02.) During the search, Mr. Johnson's

Samsung J7 phone was discovered, which he unlocked, and which

contained the same images charged in the indictments. (T3 327, 347-48.)

The agents also recovered a firearm, which Mr. Johnson admitted was his.

(T3 329-30, 340.)

The government indicted Mr. Johnson with three counts of

conspiracy to produce child pornography, in violation of 18 U.S.C.

§ 2251(a) and (e) (Counts 1-3); alleging that he was the "Ashley Campbell"

who solicited each of the three co-conspirators to send images of children's

genitals. (R. 9, pp.1-3.) He was also indicted for allegedly distributing those

images, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1) (Count 6),

sometimes allegedly using the "Ashley Campbell" account, and at least

once allegedly using his own "Lorenzo Johnson" Facebook account. (R. 9

p.7; T2 115-17.) Finally, Mr. Johnson was also indicted on one count of

being a felon in possession of a weapon, in violation of 18 U.S.C.

§ 922(g)(1) (Count 7).[3] (R. 9, p.8.)

## II.  Mr. Johnson's Timely Request For New Counsel A Year Before Trial

A year before his trial, Mr. Johnson sent a *pro se* request to the

district court for new counsel.[4] (R. 44.) Mr. Johnson told the court that he'd

received no response from his court-appointed trial counsel despite letters

and phone calls. (R. 44, pp.1-3.) He also wrote that his case had been twice

continued without his knowledge or consent. (R. 44, pp.1-3.) The court had

in fact twice continued the trial date. (R. 29, R. 43.) Mr. Johnson also

asserted his innocence and asserted that trial counsel was not explaining

the evidence against him. (R. 44, p.4.) The district court ordered a hearing

before a magistrate judge, but the magistrate judge did not inquire of

Mr. Johnson about the reasons he wanted new counsel. (SC 2-5, SA 2-5.)

---

[3] Counts 4 and 5 were brought against Mr. Johnson's co-defendant, Kelsie Gauler. Ms. Gauler committed suicide before trial and those indictments were dismissed. During trial, Counts 6 and 7 were referred to as Counts 4 and 5.
[4] Mr. Johnson has different counsel in this appeal than he had in the district court. This brief refers to the previous counsel as "trial counsel."

Instead, the judge admonished Mr. Johnson not to speak at the hearing about his objections nor to send any more letters to the court. (SC 2-5, SA 2-5.)

At the hearing, trial counsel explained that a "miscommunication" led him to believe that Mr. Johnson intended to retain private counsel. (SC 2, SA 2.) He did not explain how that related to failure to respond to his client's repeated requests for contact and information; neither did he explain whether he had failed to get Mr. Johnson's consent for motions to continue. (Id.) When trial counsel suggested that Mr. Johnson should address the court, the court responded: "Well, at this point, Mr. Johnson, you can't communicate directly with the Court. You have to communicate through counsel." (SC 3, SA 3.) The court then continued that "you're not making that decision [for new counsel] now anyway," and told Mr. Johnson to continue to discuss representation with his trial counsel. (Id.) The court reaffirmed that whether Mr. Johnson wanted new counsel was "not a decision that we're going to make. I would want a motion only to come from counsel." (SC 4, SA 4.)

### III.    Mr. Johnson's Trial Counsel Moves To Withdraw Days Before Trial

A year after the first request for new counsel, and just two days before trial, Mr. Johnson's trial counsel filed a motion to withdraw and advised that Mr. Johnson requested new counsel. (R. 90.) The district court held a hearing at which it intended to inquire of Mr. Johnson and trial counsel, outside the presence of government counsel, about the reasons for the request. (R. 93, SEAL 1-6.)

But while the government counsel was still present, and before the district court heard from Mr. Johnson or defense counsel, the court stated that it was "dubious of this, frankly" because the case had been pending for nearly two years and trial was set for the next morning. (SMH 3-4.) The district court also stated that even if Mr. Johnson and his trial counsel were "arguing" that "sometimes arguing is communicating." (SMH 4.)

The court then excluded the government. Trial counsel began by conceding that the meetings had been infrequent, but he attributed that to restrictions on in-person visitations until June 2021. (SMH 5.) Counsel then said that their conversations had deteriorated, and that in 25 years trial counsel had never before moved to withdraw this close to trial. (SMH 6.)

8

Counsel stated that he had been afraid his client would physically assault him, had they not been separated by a glass barrier. (SMH 8.)

The district court then inquired of Mr. Johnson. (SMH 9.) According to Mr. Johnson, trial counsel had not been explaining the discovery or why no pretrial motions were filed, and cited the example of a motion to suppress based on perceived discrepancies in the warrant. (SMH 9-10.) The district court opined that trial counsel likely concluded a motion to suppress was frivolous, to which Mr. Johnson answered that no one had ever explained that to him before. (SMH 10 and 13-14.)

The district court was made aware that Mr. Johnson had asked for new counsel a year earlier. (SMH 12-13.) However, the district court was not told that the magistrate judge who presided a year earlier had told Mr. Johnson not to speak. (SMH 12.) Mr. Johnson and his trial counsel also disagreed about whether Mr. Johnson had seen the discovery in his case or discussed trial strategy. (SMH 15.)

The district court denied the motion. (R. 93, SEAL 6.) The district court emphasized the timing of the motion, with trial set for the next day, but did not discuss the request by Mr. Johnson a year earlier. (SEAL 3.)

The court also repeated that disagreement between counsel and the accused did not mean there was a breakdown in communication. (SEAL 5.) The district court concluded that Mr. Johnson and his counsel were disagreeing, but still communicating, and thus denied the motion. (SEAL 5-6.) Trial commenced the next day, August 11, 2021. (R. 94.)

## IV.    The Trial

During the trial, the critical issue was the identity of the person behind the fake "Ashley Campbell" Facebook account. The prosecution used expert testimony, pictures from Mr. Johnson's phone, and his own statements to argue that "Ashley Campbell" was really Mr. Johnson. (T1 22-27.) The defense focused on failures by the government to investigate other persons who might have been able to communicate with Mr. Johnson's co-conspirators as "Ashley Campbell." (T4  469-470.) The defense chose not to contest the charge of being a felon in possession of a firearm. (T4  472-474.)

## A. The government's case: IP addresses, machine cookies, partial admissions by Mr. Johnson, and the contents of Mr. Johnson's phone.

The prosecution introduced the Facebook conversations between "Ashley Campbell," and the three co-conspirators which formed the basis of the conspiracy indictments. (T2 239-53 (Harper), T2 268-77 (Stanley), (T2 281-88 (Gauler).) The government then used electronic records to link Mr. Johnson to the "Ashley Campbell" Facebook account, as well as the "Lorenzo Johnson," "BigZo Johnson," and "Ashley Gauler" accounts.

The most government's most important evidence included that the IP address of the router in the Defendant's apartment building was used to log in to both the Facebook accounts: "Lorenzo Johnson," "Ashley Campbell." (T1 50.) The device type used was same as the defendant's phone: a Samsung J7. (T2 149.) The same machine cookies from Facebook were present in devices logging in to both accounts, suggesting it was the same device. (T2 183, 200.) Finally, federal agents found the charged images on Mr. Johnson's Samsung J7 in his home after he unlocked the phone for them. (T3 327, 347-48, 391.)

Also key to the government's case were Mr. Johnson's statements made to federal agents N.R. and C.O.[5] Specifically, Mr. Johnson admitted to possessing a firearm in his home (T3 340) and stipulated to his prior felony conviction at trial. (T1 34.) He admitted to some of the communications with co-conspirators, including Dominque Harper, including asking if she had a kid and asking her for "a picture." (T3 364, PSR 9.) He admitted to knowing that the "Ashley Campbell" bank documents were forged, and to knowing that the "Ashley Campbell" Facebook account was fake. (T3 365.) He admitted that he had sent screenshots of chats and images to Neci Taylor. (T3 357.)

However, Mr. Johnson denied soliciting the co-conspirators to create child pornography as "Ashley Campbell." (T3 357.) He insisted that other people were using the "Ashley Campbell" account, and that he did not solicit his co-conspirators to create child pornography. (T3 357.)

---

[5] By agreement with the government, this brief refers to the two agents only by their initials. They are identified by their full names within the trial transcripts.

**B. The defense argument: FBI Agents C.O. and N.R. failed to pursue other leads, including the woman in Mr. Johnson's apartment, neighbors who might have shared his IP address, and the real "Ashley Campbell."**

The defense focused on whether there were other people with access to the same IP address who could have been "Ashley Campbell." (T4 472.) Through cross-examination, the defense identified leads that the federal agents did not pursue.

Mr. Johnson's home was one unit in a five-unit building, and at least four units were occupied. (T3 383 and T3 389.) FBI Agents N.R. and C.O. testified that someone interviewed the residents of the other units, but recalled nothing about those residents. (T3 302 and T3 389.) The government's witnesses, including FBI Agent N.R., were unsure within which apartment unit the modem or router in question used was located. (T3 383.) The government's expert testified that any device using the same modem would have the same IP address. (T2 131.) Although Agent N.R. testified that the other residents were interviewed, no one asked to check any of their phones, computers, or other devices. (T3 388-90.) Although Mr. Johnson's phone was the same device type—a Samsung J7—as the one

that accessed the "Ashley Campbell" account, the government's witnesses
testified that millions of Samsung J7 devices had likely been sold. (T2 223.)

Mr. Johnson was also not alone in his home—an unidentified
woman was also there. (T3 303.) Agent C.O. testified that the woman's first
name was "Ranisha" but he did not know her last name or if she used an
alias. (T3 303.) Agent C.O. knew "very little about her" by his own
admission. (T3 317.) Agent C.O. conceded that he did not know how often
the woman had been to Mr. Johnson's home and that she could have used
any of his devices. (T3 318.) Agent N.R. testified that Mr. Johnson told
agents they could leave his house keys with the woman. (T3 373.)

The defense also challenged the decision not to find the "real"
Ashley Campbell. (T3 382-83.) Agent N.R. testified that she "forwarded the
information" about Ms. Campbell to the bureau's "white collar squad,"
but never heard back or followed up with them. (T3 382-83.)

Finally, the defense questioned agents about the failure to find or
interview Alonzo Brandon, whom Mr. Johnson identified during his
interview as being behind the "Ashely Campbell" account. Agent N.R.
testified that she did nothing to find or investigate Mr. Brandon other than

14

looking at Facebook records, which showed a lone message from

Mr. Brandon to which Mr. Johnson did not respond via Facebook.

(T3 383-84.) Agent N.R. testified that she did not purse Mr. Brandon

because there was "no reason to at that point," and described it as a "rabbit

hole." (T3 384-85.)

The jury convicted Mr. Johnson on all counts. (R. 101, T4 510-11.)

## V.    The Motion for New Trial

After the trial ended and the jury convicted Mr. Johnson on all

counts, (R. 101), the government disclosed that the two FBI agents who

testified at trial, Agents C.O and N.R., had each failed to disclose

information to the prosecutors about their possible bias—specifically, the

witnesses were in a romantic relationship with each other during the trial.

(R. 111.) Mr. Johnson moved for a new trial based on the government's

failure to disclose this evidence. (SA 8-12, SH 8-12.)

The district court asked trial counsel if he had "anything more

specific" to say about how he would have used the evidence, to which trial

counsel replied "I do not." (SA 10, SH 10.) The district court then pressed

trial counsel to explain how he would have used the bias evidence at trial:

> I guess, Mr. Tavitas, how would you have used this at
> trial? I want to make a record here. If we're going to do
> this, we're going to do it. Otherwise, I'm going to suspend
> the hearing and force you to file a motion instead of just
> dumping this in my lap and expecting me to make some
> ruling by the seat of my pants.

(SA 11, SH 11.) In response, trial counsel apologized to the court for

bringing the motion but said that his client asked him to bring it:

> I understand that, Your Honor, and I do apologize. I did go
> over, when I did get this letter, and I showed it to
> Mr. Johnson, and I indicated that I had gone over with the
> transcripts, and I gave my opinion to Mr. Johnson as if -- if
> this information had been disclosed and if it would have
> been potentially allowed at trial. I gave Mr. Johnson that
> particular opinion. But even after giving that opinion,
> again, Mr. Johnson this morning asked -- was asking me to
> orally make that request that I made. So, again, I do
> apologize to the Court.

(SA 11-12, SH 11-12.) The district court then denied the motion, "based

upon its barebones nature." (SA 12, SH 12.)

## VI.    Presentence Investigation Report and Sentencing

The district court adopted the findings of the Presentence

Investigation Report ("PSR"), which calculated Mr. Johnson's Criminal

History Category as I, the lowest possible, (PSR 15, SA 14, SH 19), and the

total offense level as 55, reduced to 43 (the maximum). (PSR 14, SA 14,

SH 19.) As the district court noted at sentencing, Mr. Johnson's calculated

16

offense level of 55 was "so far above 43 that it becomes somewhat of an

academic exercise." (SH 17.) Based upon the offense level of 43, and

Criminal History category of I, the guideline imprisonment range was life.

(PSR 21, SA 14, SH 19.)

Mr. Johnson's trial counsel did not submit a sentencing

memorandum. At the sentencing hearing, however, trial counsel asked the

district court to impose the statutory minimum sentence of 25 years:

> Your Honor, obviously, you know, in these types of cases,
> you know, the guidelines go through the roof, right? Mr.
> Johnson is looking at a potential life sentence. He
> obviously has a mandatory minimum of 25 years, and
> that's what we're asking the Court to sentence him.
>
> He's 33 years old. Does have six dependents. He has been
> incarcerated two years on this particular matter. As you
> did indicate, he does have a criminal history score of I.
>
> So for all those reasons, Your Honor, we're asking the
> Court to sentence him to the least amount of time, and
> that's being 25 years.

(SA 15, SH 20.)

The government advocated for a sentence of 50 years. (R. 116, p.1.)

In its sentencing memorandum, the government mentioned that

co-defendant Kelsie Gauler committed suicide before trial. (R.116, p.5.) The

government also described the lives of all of Mr. Johnson's alleged co-

conspirators as "irreversibly changed" because of the criminal charges

they each faced. (R.116 p.10.) The government discussed that the co-

conspirators would go to prison, and again noted that Ms. Gauler

committed suicide while awaiting trial. (R.116 p.10.)

The government also gave an oral presentation at the sentencing

hearing, immediately after Mr. Johnson's allocution and just before the

district court imposed sentence. (SA 17, SH 22.) During that presentation,

the government blamed Mr. Johnson for causing Ms. Gauler's suicide:

> On March 15th, she committed suicide, before this trial.
> And there are a lot of things that go into that. **But he's to
> blame for part of it, because if she had never had this
> man drop into her life, maybe she'd still be here today**.
> Maybe her children would have a mother to call to help
> them get ready in the morning for school.

(bold added) (SH 23-24, SA 18-19.) After the government's presentation,

the district court proceeded to pronounce sentence without inviting the

defense to comment on the government's remark blaming Mr. Johnson for

Ms. Gauler's death. (SH 27, SA 22.)

The district court considered Ms. Gauler and the other women who

sent images to "Ashley Campbell" as "both victims and co-conspirators."

(SH 25, SA 20.) The district court found that Mr. Johnson's offense caused

Ms. Gauler's suicide, and considered that death as part of the § 3553

factors in sentencing him, specifically, the nature of the offense:

> Which brings us to Ms. Gauler. Perhaps the biggest
> tragedy of all. She was a Codefendant in this case. I think,
> if I'm remembering correctly, she was set to go to trial, and
> she was released on bond, you know, earlier in the case.
> And she took her own life. And, surely, the burden of this
> case and the publicity from the case and the other shame
> that she likely endured for the behavior she engaged in
> surely played a role in that. No one could conclude
> otherwise. And that's just a tremendous tragedy.
>
> So I don't think there's anything more I need to say about
> the nature and circumstances of the offense. It's just about
> as bad as it gets. Short of taking someone's life. And in
> many ways, that's what the consequences of it was anyway
> with the result of Ms. Gauler's fate. Of course, you didn't
> have any intention of that happening, and I'm not
> suggesting that, but that was the consequence of it. So the
> nature of the offense could hardly get any more serious.

(SH 31-32, SA 26-27.) The district court then sentenced Mr. Johnson to 600

months (i.e., 50 years) for counts 1-3, 480 months for Count 6, and 120

months for Count 7, all concurrent to one another.  (SA 29 and 37; R. 120

at 3.)

The district court both imposed sentence and entered a written

judgment on December 17, 2021.  (R. 120, SA 29-31.) Mr. Johnson filed his

notice of appeal on December 18, 2021.  (R. 125.)

## SUMMARY OF ARGUMENT

The district court erred by denying Mr. Johnson's request for new counsel. Mr. Johnson sought new counsel a year before trial, at which time he was admonished not to contact the court again; he should not be penalized because counsel waited until the eve of trial to file a request for substitution of counsel. That error was not harmless because trial counsel failed to make any argument in support of the motion for new trial. Because motions for new trial are committed to the discretion of the trial court, the case should be remanded for new counsel to submit a written motion for new trial and, if appropriate, an evidentiary hearing. Alternatively, this Court should reexamine its precedent requiring a defendant to prove that the court's error was not harmless.

The district court also erred in denying the motion for a new trial. Although trial counsel's motion was "barebones," (SH 12, SA 12), the trial court was aware of the nature of the undisclosed impeachment evidence and the importance of the witnesses' testimony. Because the defense at trial focused on failure to investigate other leads, a motive for the investigators to excuse one another's mistakes would have bolstered the defense.

Finally, the district court erred by holding Mr. Johnson responsible for the suicide of his co-defendant, Ms. Gauler. Neither the prosecution nor the PSR produced any evidence that Ms. Gauler's suicide was caused by the offense conduct, rather than by mental illness, depression, or some preexisting motive. This Court should vacate Mr. Johnson's sentences and remand for re-sentencing.

## ARGUMENT

### I. The district court erred when it denied Mr. Johnson's two requests to replace his court-appointed counsel.

#### A. The standard of review is abuse of discretion.

If a district court has inquired into the reasons for a defendant's request, then a denial of a motion for new appointed counsel is reviewed for abuse of discretion. <u>United States v. Zillges</u>, 978 F.2d 369, 371 (7th Cir. 1992). In considering whether a district court abused its discretion, this Court "consider[s] several factors, including (1) the timeliness of the motion; (2) whether the district court conducted an adequate inquiry into the matter; and (3) whether the breakdown between lawyer and client was so great as to result in a total lack of communication, precluding an adequate defense." <u>United States v. Ryals</u>, 512 F.3d 416, 419 (7th Cir. 2008).

Even if a district court abuses its discretion, remand is warranted only if the defendant was prejudiced by the error, meaning there is a "reasonable probability" of a "different result." Id.

> **B. The district court abused its discretion by failing to inquire about the reasons for Mr. Johnson's first request for new counsel.**

The district court abused its discretion by failing to inquire into the reasons for Mr. Johnson's request for new counsel. The court explicitly told Mr. Johnson not to speak about his concerns at the hearing, and announced that whether to appoint new counsel was "not a decision that we're going to make. I would want a motion only to come from counsel." (SC 4, SA 4.). Mr. Johnson was left at the mercy of an attorney whom he'd told the district court was not communicating with him.

This is not a case where the district court could dispense with an inquiry based upon the defendant's previously stated reasons. Although Mr. Johnson's letter was detailed, it also contained concerning allegations that should have been addressed by the district court. Most alarmingly, Mr. Johnson stated that he did not know his case was being continued on two occasions until his family contacted the courthouse and learned he had a new trial date. (R. 44 pp.2-3.) Rather than ask trial counsel whether

that was correct, or why that miscommunication had happened, the district court instructed both trial counsel and Mr. Johnson that it would not be deciding the issue at all. (SC 4, SA 4.). Such a refusal to exercise discretion is an abuse of discretion. See Zillges, 978 F.2d at 372.

Nor should Mr. Johnson be penalized for failure to appeal the magistrate judge's ruling denying his request for new counsel. When the motion at issue is a request to replace court-appointed counsel, "it would be inequitable to foreclose appeal of this matter because the very attorney he claimed was inadequate and with whom he allegedly could not communicate failed to preserve the issue for appeal." United States v. Brown, 79 F.3d 1499, 1504–05 (7th Cir. 1996). In this case, Mr. Johnson was explicitly told not to contact the court again and that only his trial counsel—whom Mr. Johnson said was not speaking to him or telling him about continuances—could file a motion to substitute counsel. Just as in Brown, punishing Mr. Johnson for his counsel's failure to seek review by the district judge would be inequitable.

Because the district court failed to inquire into Mr. Johnson's conflict with his trial counsel at all in August of 2020, the initial remedy should be

23

a remand to the district court "to decide whether substitution was

appropriate" at the time of Mr. Johnson's first hearing, August 20, 2020.

See Martel v. Clair, 565 U.S. 648, 666 n.4, 132 S. Ct. 1276, 1289 (2012).

### C. The district court stressed the timing of the second motion for new counsel, but should have given greater weight to Mr. Johnson's previous attempts to ask the court for new counsel.

The district court abused its discretion in denying the second motion

for new counsel based upon the motion's timing. As this Court has

explained: "Our concern, of course, with untimely requests for new

counsel is that they are nothing more than tactics to manipulate or delay

the trial." United States v. Huston, 280 F.3d 1164, 1167 (7th Cir. 2002). And

on the surface, Mr. Johnson's motion two days before his trial could have

been viewed that way, but for the fact that he'd sent a *pro se* request for

new counsel a year earlier. Requests for new counsel a year ahead of trial

are timely. See, e.g., Brown, 79 F.3d 1499, 1506 (7th Cir.1996) (holding that

a request made two months before trial was timely); Zillges, 978 F.2d at

372 (one month).

The district court was aware that Mr. Johnson had previously

sought new counsel a year earlier, but it appears the judge was not aware

that Mr. Johnson had not been permitted to address the court at that time,
nor that he'd been told not to contact the court again—because only his
attorney could file a request for new counsel. (SMH 12-13.) Trial counsel
admitted he was loathe to file such a motion, leaving Mr. Johnson with
nowhere to turn.

The district court effectively gagged Mr. Johnson after his first
request for new counsel, and then the court punished him for not speaking
up sooner. The only in-person hearing between August 20, 2020, until the
sealed hearing on August 10, 2021, was the July 20, 2021, Final Pretrial
Conference—for which Mr. Johnson was not present. (FPT 1, 9.) Because
Mr. Johnson had done all he reasonably could do to alert the district court
that he needed new counsel, the timing of the motion should not have
been an adverse factor.

### D. Counsel and Mr. Johnson demonstrated their continued failure to communicate at the hearing.

The third factor in this Court's inquiry is whether there was a
breakdown in communication between client and attorney. United States
v. Ryan, 885 F.3d 449, 452–53 (7th Cir. 2018). In this case, the district court
concluded that trial counsel and Mr. Johnson were disagreeing, but

communicating. (SEAL 5-6.) But Mr. Johnson's objections at the hearing were not that he disagreed with counsel's decisions, such as not filing a motion to suppress, but that no one had explained those decisions to him. (SMH 10.) He had also informed the court in his letter that his counsel failed to consult or even inform him before filing continuances. (R. 44, pp.2-3.) Trial counsel conceded there had been less communication than usual, and told the district court that he'd been afraid his own client would hurt him. (SMH 8.) Those issues went beyond disagreement; they evinced a failure to communicate with the only counsel who'd ever been appointed on Mr. Johnson's case.

### E. The failure to replace counsel was not harmless because trial counsel made no attempt to win the motion for a new trial.

Under this Court's current precedent, a district court's abuse of discretion in denying a motion for new appointed counsel is harmless unless the defendant demonstrates prejudice, "meaning that but for the error, there is a reasonable probability that the sentencing would have produced a different result." Ryals, 512 F.3d at 419.[6]

---

[6] This Court has equated its harmless error test for erroneous denial of new appointed (cont'd…)

This Court's ruling in <u>Ryals</u> is instructive here. In that case, this Court found a defendant was prejudiced by denial of a motion for new counsel because his attorney's "'argument' did more harm than good." <u>Ryals</u>, 512 F.3d at 420–21 (quotation marks in original). Instead of arguing for a lower sentence, the defendant's counsel pointed out his client's recidivism, the same point emphasized by the government. <u>Id.</u> Although there was no way to know whether "a better argument would have swayed the district court … we *can* be certain that counsel's argument stood almost no chance." <u>Id.</u>

In this case, when the court asked why it should grant the motion for new trial, Mr. Johnson's trial counsel had no answer. Instead, trial

---

(…cont'd)

counsel with a claim of ineffective assistance, and suggested that challenging a district court's error on direct appeal would preclude any collateral attack based on ineffective assistance of counsel. <u>See</u> <u>United States v. Wallace</u>, 753 F.3d 671, 675 (7th Cir. 2014). <u>Wallace</u> also notes, however, that claim preclusion for ineffective assistance is issue-specific. <u>See</u> <u>Wallace</u>, 753 F.3d at 675-76, <u>citing</u> <u>Yick Man Mui v. United States</u>, 614 F.3d 50, 55 (2d Cir. 2010) (reversing dismissal of ineffective assistance claims because some claims were not raised on direct appeal). But at other points, this Court has suggested that "ineffective assistance of counsel is a single ground for relief no matter how many failings the lawyer may have displayed." <u>Peoples v. United States</u>, 403 F.3d 844, 848 (7th Cir. 2005).

If this Court would preclude Mr. Johnson from raising *any* challenge to trial counsel's performance in a collateral attack based on his discrete challenge to counsel's failure to try to win the motion for new trial, then Mr. Johnson has asked counsel to withdraw this argument, consistent with this Court's practice in past cases. <u>See, e.g.</u>, <u>Wallace</u>, 753 F.3d at 675–76.

counsel told the court that he'd given his client his legal opinion about the merits of moving for a new trial, and that his client "still wanted" to move for a new trial. The implication was that defense counsel had advised his client there was no basis to make this motion, and he was making the motion now only to mollify his client. Trial counsel was telling the court to deny the motion he was making.

"We cannot know for certain that a better argument would have swayed the district court, but we can be certain that counsel's argument stood almost no chance." Ryals, 512 F.3d at 420–21. If any argument could fall beneath the low bar set by Ryals, it was the argument (lack thereof) for a new trial in this case. The motion "stood almost no chance" because trial counsel made no attempt to answer the court's question about how the undisclosed information about the FBI agents' bias could have been used during the trial or in trial preparation. Instead, trial counsel apologized to the district court for bringing the motion and implied to the district court that he had advised his client the motion was meritless. As discussed further below, trial counsel could have presented robust arguments in favor of a new trial and failed to do so.

That Mr. Johnson has appealed the denial of the motion for new trial does not scrub the stain of this error from his case. This Court reviews motions for a new trial only for an abuse of discretion, and based only on the facts in the record. <u>See</u> <u>Zillges</u>, 978 F.2d at 371. In this case, Mr. Johnson is left to appeal the denial of only a "barebones" motion that his own counsel implied should be denied. This Court should order a limited remand for a new motion hearing at which the district court may exercise its discretion in the first instance.

### F.  Alternatively, this Court should reconsider its precedent on harmless error when a district court erroneously denies a motion to appoint new counsel.

This Court should re-examine its harmless error test for denials of motions for new counsel.[7] The current test serves to discourage correction of district court errors on direct appeal, whereas the more typical harmless error test set forth in <u>Chapman v. California</u>, 386 U.S. 18, 87 S.Ct. 824 (1967), in which the government must prove an error was harmless beyond a reasonable doubt, would not.

---

[7] Mr. Johnson understands that this panel is bound by circuit precedent, but asks that the panel use the procedure in Circuit Rule 40(e).

This Court appears to have first developed its current test in United States v. Morrison, 946 F.2d 484, 499 (7th Cir. 1991) cert. denied, 506 U.S. 1039, 113 S.Ct. 826, 121 L.Ed.2d 696 (1992); see also generally United States v. Zillges, 978 F.2d 369 (7th Cir. 1992). In Morrison, this Court reasoned by analogy that because defendants are allowed to change counsel "to ensure that they are afforded the effective assistance of counsel," therefore it follows that any error is harmless unless it violates the defendant's Sixth Amendment right to counsel. Morrison, 946 F.2d at 499; see also United States v. Williams, 616 F.3d 685, 689–90 (7th Cir. 2010) ("In Zilges, we analogized to Strickland .. in reaching our determination."). This Court has consistently applied that rule, see, e.g., Williams, 616 F.3d at 689–90, and several other circuits have followed suit. See, e.g., United States v. Calderon, 127 F.3d 1314, 1343 (11th Cir.1997); United States v. Graham, 91 F.3d 213, 221 (D.C.Cir.1996).

The consequence of the Morrison formulation of a harmless-error test that mimics the test for ineffective assistance of counsel has been that challenging a district court's error on direct appeal results in the loss of any collateral attack based on ineffective assistance of counsel. See, e.g.,

United States v. Wallace, 753 F.3d 671, 675 (7th Cir. 2014). Some circuits have held that erroneous denials of motions for new counsel *cannot* be challenged on direct appeal for that reason. See, e.g., United States v. Senke, 986 F.3d 300, 314–15 (3d Cir. 2021), cert. denied, 142 S. Ct. 367, 211 L. Ed. 2d 195 (2021).

### a. The Tenth Circuit has considered and rejected this Court's approach.

The Tenth Circuit considered and rejected this Court's approach in United States v. Lott, 310 F.3d 1231, 1252–53 (10th Cir. 2002); cert. denied, 538 U.S. 936 and 538 U.S. 991 (2003). While agreeing that harmless error analysis was appropriate, the court in Lott determined that the harmless error analysis set forth in Chapman was the correct standard. See Lott, 310 F.3d at 1250. The Tenth Circuit recognized that the Seventh Circuit had come to a different result, see Lott, 310 F.3d at 1251-52, but rejected that approach for three reasons.

First, the Lott court distinguished Strickland, which examines the trial as a whole, from denial of a motion to substitute counsel, which can occur at any time. Lott, 310 F.3d at 1252. Second, adopting a harmless error test that incorporated Strickland would prevent defendants from

challenging erroneous denials of motions for new counsel on direct review. <u>Lott</u>, 310 F.3d at 1252. Third, the court held that whether a counsel was *deficient* was distinct from whether counsel could *communicate* with the defendant. <u>Lott</u>, 310 F.3d 1253.

The subsequent history of the <u>Lott</u> case shows that the <u>Chapman</u> standard is a workable one. The Tenth Circuit remanded the case for an evidentiary hearing. <u>See</u> <u>United States v. Lott</u>, 433 F.3d 718, 721 (10th Cir. 2006) ("Lott II") (Discussing procedural history). Ultimately, after remand and second appeal, the Tenth Circuit applied the <u>Chapman</u> harmless error test and affirmed the judgment, holding that the government demonstrated that any error was harmless. <u>Lott II</u>, 433 F.3d at 723.

> **b. When a district court errs and that error is challenged on direct appeal, the government should have the burden of proving harmlessness beyond a reasonable doubt.**

This Court should adopt the reasoning in <u>Lott</u>. As the Tenth Circuit predicted, this Court's harmless error test has resulted in effectively barring defendants from appealing denials of motions for new counsel *at all* on direct appeal. <u>See, e.g.</u>, <u>Wallace</u>, 753 F.3d at 675 (dismissing challenge to district court's denial of motion for new counsel to prevent

preclusion of ineffective assistance claim on collateral attack). The more clearly erroneous the district court's ruling, the greater the risk to the defendant in challenging it, because this Court would then be forced to reach the harmless error test and preclude any future collateral claim that counsel was ineffective. That's a strange result for a harmless error test to dissuade defendants from appealing a ruling at all.

Reformulating the harmless error test would remove any concern about claim preclusion, allowing this court to correct errors by the district court on direct review. See Lott, 310 F.3d at 1252. If the government has the burden—as it does with other errors—to prove harmlessness beyond a reasonable doubt, that would not prevent a collateral challenge to trial counsel's performance. Nor is there a compelling reason why defendants should have the burden of proof that *this* error caused prejudice, but do not shoulder that burden of proof for other errors.

This Court's harmless error test is also anomalous given that the complete *absence* of counsel from a preliminary hearing is usually reviewed for harmless error under the familiar Chapman test. See Coleman v. Alabama, 399 U.S. 1, 11, 90 S. Ct. 1999, 2004 (1970) ("The

test to be applied is whether the denial of counsel at the preliminary hearing was harmless error under <u>Chapman v. California</u>."); <u>see also</u> <u>Ditch v. Grace</u>, 479 F.3d 249, 256 (3d Cir. 2007) ("<u>Coleman's</u> harmless error analysis remains good law."); <u>United States v. Owen</u>, 407 F.3d 222, 227 (4th Cir. 2005) (same). This Court has applied the <u>Chapman</u> harmless-error test to determine if counsel's absence during a verdict was harmless. <u>Siverson v. O'Leary</u>, 764 F.2d 1208, 1219 (7th Cir. 1985) (holding that defense counsel's absence during verdict was harmless beyond a reasonable doubt). Defendants cannot communicate with a lawyer who isn't there, so there's no reason why defendants appealing from an erroneous denial of a motion for new counsel based on inability to communicate should be subjected to a more demanding harmless error standard.

Finally, as a matter of judicial policy, a trial court's errors should be reviewable on direct appeal, whereas counsel's errors are more appropriately addressed in a collateral attack. When this Court holds that a district court erroneously denied a motion for new counsel, it is the *district court* that made an error. By contrast, when a defendant asserts ineffective assistance of counsel, the *lawyer* made an error—not the court.

Indeed, the distinction that the defense attorney, rather than the court or government, created the error was an important part of <u>Strickland</u>'s analysis. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067 (1984). (Noting that the government "is not responsible for, and hence not able to prevent, attorney errors that will result in reversal of a conviction or sentence."). The prejudice prong of <u>Strickland</u> was never intended to double as a harmless error test, because it "does not ask whether an error was harmless but whether there was an error at all." <u>Weaver v. Massachusetts</u>, 137 S. Ct. 1899, 1916, 198 L. Ed. 2d 420 (2017) (Alito, J., concurring). A harmless error standard which discourages review of a district court's errors (as opposed to defense counsel's errors) on direct appeal stymies appellate review.

For all those reasons, this Court should revise its precedent, and apply the <u>Chapman</u> standard of harmless error review on direct appeal to erroneous denials of motions for new counsel, requiring the government to demonstrate harmlessness beyond a reasonable doubt.

## II.   The district court erred when it denied the motion for a new trial.

### A. The standard of review is abuse of discretion

This Court reviews a district court's denial of a motion for a new trial for abuse of discretion. <u>United States v. Curtis</u>, 280 F.3d 798, 803 (7th Cir. 2002). A claim for a new trial based on a failure to disclose favorable evidence has three elements: (1) the evidence must be favorable to the defense, (2) the government must have failed to disclose it, and (3) there must be "a reasonable probability that the suppressed evidence would have produced a different verdict." <u>United States v. Morales</u>, 746 F.3d 310, 314 (7th Cir. 2014).

"Impeachment evidence" falls within the <u>Brady</u> rule." <u>United States v. Bagley</u>, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985); <u>see also</u> <u>Morales</u>, 746 F.3d at 315. This Court has observed that "ordinarily, newly discovered impeachment evidence will not warrant a new trial … but that's not a categorical rule." <u>United States v. Salem</u>, 578 F.3d 682, 688 (7th Cir. 2009). The question will be the importance of the witness's credibility to the defense. <u>Id.</u> This Court also requires that the evidence be admissible at trial in some form. <u>Id.</u>

**B. Despite the brevity of trial counsel's oral motion, the district court knew the nature of the withheld evidence and the thrust of the defense at trial.**

The district court's description of the new trial motion as "barebones" was apt. (SH 12, SA 12.) But despite its brevity, the oral motion put the court on notice of the key facts before it: That the agents had failed to disclose their romantic relationship when asked about sources of potential bias, and that the information could bear on their objectivity. (SH 10-11, SA 10-11.) The district court was also present throughout the trial and was familiar with the evidence and the arguments of trial counsel that the agents had failed to follow leads, failed to adequately investigate, and failed to research individuals such as Ashley Campbell or Alonzo Brandon.

**C. Evidence of bias would have bolstered the defense theory that the government failed to investigate other leads into "Ashley Campbell"**

The defense focused on the agents' failure to eliminate other possible suspects who could have been "Ashley Campbell" at the time of the Facebook messages forming the conspiracy. And it *was* possible for others to have used the same type of device to access that account from the very same IP address—including the occupants of the other four

apartments, the unidentified woman in Mr. Johnson's apartment when police arrived, and even Alonzo Brandon. All or any of them could have used with the same IP address had they logged into the same router. And although Mr. Johnson did make several incriminating statements during his interview, the jury also heard Mr. Johnson telling the agents that *other people* accessed the "Ashley Campbell" Facebook account.

Because the defense was focused on a failure to investigate, evidence of bias or motive to excuse mistakes or oversights by a fellow agent could have been used to sway the jury. Agents N.R. and C.O. responded to suggestions that they interview or run a criminal history check on other possible suspects, such as the unidentified woman in Mr. Johnson's home, the real Ashley Campbell, or Alonzo Brandon, were dismissed as "rabbit holes." Perhaps both agents genuinely agreed there was no need to find or even look up Alonzo Brandon, or perhaps one agent dropped the ball, and the other agent was quick to excuse a romantic partner's mistake. Trial counsel could also have questioned whether their budding romance had been a distraction, causing them to forget such details as the name of the woman discovered in Mr. Johnson's home. The existence for each agent of

a personal motive to overlook or excuse any shortcoming in another agent's work would have been powerful evidence to attack the government's case at trial.

The evidence also bore on each agent's credibility. Agents C.O. and N.R. testified that other leads suggested by the defense were unimportant or "rabbit holes." Their credibility in characterizing the evidence to the jury as unimportant would have been undermined by evidence that those same agents had failed to truthfully disclose their relationship when asked. Trial counsel could also have conducted limited discovery to learn *how* this information came to light, and why it had been concealed. If the agents had been concealing their relationship from not only the prosecutors but from others, it could also have shed light on the agents' credibility and character for truthfulness.

The government may argue that its case against Mr. Johnson was simply too strong for any jury to be swayed by evidence of bias. Perhaps the single strongest piece of evidence was that Mr. Johnson's Samsung J7 phone, found in his apartment, unlocked by him for the federal agents,

contained the very images at issue in this case—a point the government emphasized with its redirect examination of Agent N.R. (T3 391.)

If Mr. Johnson had been charged with possession of those images, the government might have a point. He was not. He was charged with entering into a conspiracy to produce those images, and on those charges, the government's evidence was circumstantial. That he possessed the images does not prove that he conspired to produce them. Instead, proof of the conspiracy required the government to prove that Mr. Johnson *was* "Ashley Campbell," and that he was the person at the keyboard typing as "Ashley Campbell" at the time of those specific Facebook messages.

No one challenges that the government put on legally sufficient evidence, but its case on the conspiracy charges was also not so overwhelming that the government should be excused from disclosing relevant impeachment evidence about its own key witnesses. That's particularly true when those witnesses are themselves federal agents, and the defense at trial was focused on the failure of those agents to pursue other leads. The motion for new trial should have been granted.

## III.    The district court erred when it concluded that Mr. Johnson's co-defendant's suicide was caused by

**his offense, and relied upon that conclusion to impose sentence.**

### A. The standard of review is *de novo*

This Court reviews *de novo* a claim that a district court procedurally erred by spontaneously relying on inaccurate factual information or an inappropriate sentencing factor. See United States v. Wood, 31 F.4th 593, 598–99 (7th Cir. 2022). Mr. Johnson was not faulted for Ms. Gauler's death in the PSR, and as this Court recently clarified, when a sentencing court's factual findings were not included in the PSR nor a factual presentation by the government, the defendant is not required to object in order to preserve error. See Wood, 31 F.4th at 598–99. (Holding that because the district court first announced its factual finding while announcing sentence, the defendant "was not obligated to take exception with the district court's ruling to preserve his argument on appeal."). If instead this Court finds that Mr. Johnson had adequate notice that the district court intended to hold him responsible for his co-defendant's suicide, then this Court reviews for plain error. See Wood, 31 F.4th at 598. The district court's specific factual findings are reviewed for clear error. Wood, 31 F.4th at 599.

41

### B. Mr. Johnson has a due process right to be sentenced based on reliable information proved by a preponderance of the evidence.

Defendants have a due process right "to not be sentenced on the basis of improper factors or erroneous information." <u>United States v. Harris</u>, 558 F.2d 366, 374–75 (7th Cir. 1977); <u>see also</u> <u>Wood</u>, 31 F.4th at 599 (7th Cir. 2022). The sentencing court commits a "significant procedural error if it selects a sentence based on clearly erroneous facts." <u>United States v. Oliver</u>, 873 F.3d 601, 608–09 (7th Cir. 2017) (quotations omitted). A district court's reliance upon clearly erroneous facts or inappropriate sentencing factors is a procedural error. <u>See</u> <u>Wood</u>, 31 F.4th at 599 (7th Cir. 2022).

At sentencing, the government must prove factual assertions beyond those proven at trial by a preponderance of the evidence. <u>United States v. Banks</u>, 964 F.2d 687, 692 (7th Cir. 1992) ("The government must prove by a preponderance of evidence the occurrence of the conduct that it asks the court to consider as relevant."); <u>see also</u> <u>United States v. Jackson</u>, 983 F.2d 757, 771–72 (7th Cir. 1993) (Government admitted error when district court found quantity of narcotics involved in relevant conduct without first resolving disputed facts).

42

**C. The district court erroneously concluded that the offense "played a role" in the suicide of Mr. Johnson's co-defendant, Ms. Gauler, without hearing any evidence from either party about Ms. Gauler's motives.**

The district court erred when it concluded, without evidence, that Mr. Johnson "played a role" in Ms. Gauler's suicide and that "no one could conclude otherwise." (SH 31, SA 26.) There was no factual basis in the record to support that Ms. Gauler's suicide was caused by Mr. Johnson's conduct.

Without knowing more about Ms. Gauler, the court could not know why she decided to end her life. As another circuit has observed in a recent unpublished decision: "Suicide is a complicated phenomenon that may be caused by any number of preceding events." United States v. Robinson, 843 F. App'x 607, 609–10 (5th Cir. 2021), cert. denied, 142 S. Ct. 297, 211 L. Ed. 2d 139 (2021). Rather than being a calculated or rational decision, most psychiatrists view suicide as a result from mental illness or psychiatric disorder. See, e.g., Allen C. Schlinsog, Jr., The Suicidal Decedent: Culpable Wrongdoer, or Wrongfully Deceased?, 24 J. MARSHALL L. REV. 463, 477 n.67 (1991) (collecting in footnote 67 psychiatric studies linking suicide to mental illness and/or disorders of the frontal cortex.); Alison Liebling,

Prison Suicide and Prisoner Coping, 26 CRIME & JUST. 283, 302 (1999)

(discussing how motives for suicide can vary, and noting that "there is a

strong association between psychiatric illness and suicide.").

This Court addressed a defendant's responsibility at sentencing for a

victim's suicide in United States v. Serhant, 740 F.2d 548 (7th Cir. 1984). In

that case, the defendant was convicted of fraud and the PSR included a

suicide note written by one of the defrauded victims. Serhant, 740 F.2d

at 553. The defendant contested its conclusion as unfairly prejudicial, and

produced evidence that unrelated factors could have contributed to the

deceased's suicide. Id.

This Court assumed *arguendo* that inclusion of the suicide note was

improperly prejudicial, but affirmed the sentence because the district court

made no mention of the suicide in passing sentence. Serhant, 740 F.2d

at 553. The Court also observed that the defendant "adequately rebutted

this information with his description of other events which led to the

suicide's demise" as further assurance that any error was harmless. Id.

Although this Court assumed, rather than held, that the suicide note was

improper, the Court's reasoning supports that suicide can have many causes and is not always attributable to a defendant's crimes.

The Fifth Circuit reached a similar conclusion in its unpublished decision in <u>Robinson</u>, 843 F. App'x at 609–10. In that case, the Fifth Circuit held that consideration at sentencing of a victim's boyfriend's suicide was error, because any "causal relationship was too attenuated to provide a basis for enhancing Robinson's sentence." <u>Id.</u> The court went on to hold that the error was harmless because the district court was clear that it would have imposed the same sentence regardless of the suicide. <u>Id.</u>

Mr. Johnson does not argue that a defendant can *never* be responsible for a suicide as a result of his offense. Certainly, a district court presented with a factual basis could do so. But by the same token, a defendant is not *always* responsible for suicides that occur after his offense. Instead, the government must prove such a link by a preponderance of the evidence. <u>See</u> <u>Banks</u>, 964 F.2d at 692 ("The government must prove by a preponderance of evidence the occurrence of the conduct that it asks the court to consider as relevant.").

In this case, as in <u>Serhant</u> and <u>Robinson</u>, there was insufficient

evidence to demonstrate that the charged conduct caused Ms. Gauler's

decision to end her life. The only documentary evidence in the record is

Ms. Gauler's obituary, which does not identify the cause of death. (R. 16-1.)

That she died by suicide is based solely on a representation made in the

government's motion to dismiss (R. 16) and one sentence in the PSR:

"Kelsie Gauler died by suicide five months before trial." (PSR 7.)[8] On this

record, we know nothing of her mental and physical health before her

death. Nothing in the record reveals Ms. Gauler's motives for taking her

own life, or even if her motives are known.

Unlike in <u>Serhant</u> and <u>Robinson</u>, however, the district court

explicitly relied upon Ms. Gauler's suicide in imposing sentence. The

district court discussed the nature of the offense as one of the § 3553(a)

factors. (SH 29, SA 24.) The district court discussed Ms. Gauler's suicide

and explicitly blamed Mr. Johnson for causing it. (SH 31-32, SA 26-27.) This

---

[8] Trial counsel also made a spontaneous representation to the court at the Final Pretrial Conference (at which Mr. Johnson was not present) that Ms. Gauler hung herself after giving birth to a child which she had given up for adoption. (FPT 14.) The source and accuracy of trial counsel's information is unknown, and was not before the district court at sentencing.

record demonstrates that the district court relied on its conclusion that

Mr. Johnson was responsible for Ms. Gauler's suicide when it imposed

sentence.

### D. Mr. Johnson lacked notice and an opportunity to present evidence to rebut the court's conclusion about Ms. Gauler's motives for suicide.

Mr. Johnson was entitled to advance notice and an opportunity to

rebut any factual assertions or findings upon which the district court

would rely at sentencing. While the exact requirements vary depending on

the nature of the dispute, "statutory and case law make clear that parties

are entitled to notice and an opportunity to be heard regarding disputed

sentencing issues." United States v. Sienkowski, 359 F.3d 463, 467 (7th Cir.

2004) (reversing and remanding because government was not given an

opportunity to present additional evidence at sentencing). "The right to be

heard has little reality or worth unless one is informed that a decision is

contemplated." United States v. Jackson, 32 F.3d 1101, 1106 (7th Cir. 1994)

(quotations omitted) (reversing and remanding for resentencing because a

defendant lacked advance notice of a disputed issue).

Even if a reasonable court could conclude from this record that

Mr. Johnson's offense played a role in Ms. Gauler's suicide, he deserved

advance notice of that issue and a chance to present rebuttal evidence.

There is no way to know whether, had Mr. Johnson been given that

opportunity, the district court might have reached a different conclusion.

Cf., e.g., Serhant, 740 F.2d at 553 (observing that defendant successfully

rebutted allegations that he was to blame for suicide of victim's boyfriend).

Neither the court nor the government notified Mr. Johnson that he was

being held responsible at sentencing for Ms. Gauler's suicide until after his

counsel's sentencing argument and his allocution were complete.

The PSR mentioned Ms. Gauler's suicide only to explain why she

was unavailable for trial. (PSR 7.) The government's sentencing

memorandum discussed Ms. Gauler's suicide but stopped short of

blaming Mr. Johnson for causing it. (R. 116, pp. 5, 10.) At sentencing,

however, after Mr. Johnson's allocution and immediately before the

district court imposed sentence, the government asserted that "there a lot

of things that go into that [suicide]. But he's to blame for part of it." (SH 23,

SA 18.) And the district court never invited Mr. Johnson to comment on

Ms. Gauler's suicide or put him on notice that he would need evidence to

rebut a presumption that he caused her death before the court pronounced sentence. (SA 22-29, SH 27-34.)

On this record, Mr. Johnson and his counsel had no notice that the district court intended to hold Mr. Johnson responsible for Ms. Gauler's suicide. The district court explicitly relied upon that finding as part of imposing the sentence, and therefore this case should be remanded for resentencing.

## CONCLUSION

For all of the foregoing reasons, Mr. Johnson respectfully requests that this Court VACATE his convictions and REMAND for a new trial.

Alternatively, Mr. Johnson asks that this Court REMAND this case for the limited purpose of appointing counsel to draft and argue a motion for new trial, so that the district court may consider that motion in its discretion in the first instance.

Should this Court instead affirm Mr. Johnson's convictions, or if the matter is remanded only for a new motion hearing, then Mr. Johnson also asks that this Court VACATE his sentence and REMAND for resentencing.

Respectfully submitted,
/s/ Jeremiah R. Newhall
*Attorney for Defendant-Appellant*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App.
   P. 32(a)(7)(B) because:

    _X_ this brief contains 11124 words, including all footnotes, as
       shown by Microsoft Word Office 365 in preparing this brief.

2. This brief complies with the typeface requirements of Fed. R. App.
   P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)
   because:

    _X_ this brief has been prepared in a proportionally spaced typeface
       using Microsoft Word in 13 point Palatino Linotype font.

                                    /s/ Jeremiah R. Newhall
                                    Attorney for Defendant-Appellant

                                    Dated: July 12, 2022

# PROOF OF SERVICE

The undersigned attorney hereby certifies that he has caused a copy of the
foregoing to be filed with the Clerk of Court using the CM/ECF system
and served, by the electronic filing system, upon all attorneys of record, on
this 12th day of July, 2022.

                          BY:    /s/ Jeremiah R. Newhall
                                 Jeremiah R. Newhall

No. 21-3345

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LORENZO JOHNSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
For the Northern District of Indiana,
Hammond Division.
No. 2:20-CR-007-PPS-JEM
The Honorable Philip P. Simon, Judge.
_____

APPELLANT'S REQUIRED SHORT APPENDIX

_____

Jeremiah R. Newhall
*Attorney for Defendant-Appellant*
Newhall Law Firm
2024 W. Henrietta Road
Suite 2-A
Rochester, NY 14623
(202) 615-9782
Jeremiah@newhallfirm.com

No. 21-3345

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**LORENZO JOHNSON,**

**Defendant-Appellant.**

_____

**Appeal from the United States District Court
For the Northern District of Indiana,
Hammond Division.
No. 2:20-CR-007-PPS-JEM
The Honorable Philip P. Simon, Judge.**

_____

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30**

The undersigned, counsel for Defendant-Appellant, Lorenzo Johnson, hereby states that all of the materials required by Circuit Rule 30(a) and 30(b) are included in the Appendix to this brief EXCEPT those materials included in a separate sealed Appendix by Order of this Court.

BY:     /s/ Jeremiah R. Newhall
        Jeremiah R. Newhall
        *Attorney for Defendant-Appellant*

Dated July 12, 2022

SA ii

## Appendix Table of Contents

Certification ................................................................................................ SA ii

Status Hearing Transcript ........................................................................ SA 1

Sentencing Hearing Transcript (Motion for New Trial, pp. 1, 8-12) ................. SA 7

Sentencing Hearing Transcript (Sentencing, pp. 18-39) .................................... SA 13

Judgment in a Criminal Case .................................................................... SA 35

<pre>
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF INDIANA
 2                        HAMMOND DIVISION

 3    UNITED STATES OF AMERICA,      )
                                     )
 4      vs.                          )   Case No.
                                     )   2:20-cr-00007-PPS-JEM
 5    LORENZO JOHNSON,               )
                                     )
 6          Defendant.               )
      _____  )

 7
                        STATUS CONFERENCE
 8                      AUGUST 20, 2020
             BEFORE THE HONORABLE JOHN E. MARTIN
 9              UNITED STATES MAGISTRATE JUDGE

10    VIDEO/TELEPHONIC APPEARANCES:

11    FOR THE GOVERNMENT:        JILL R. KOSTER - AUSA
                                 U.S. Attorney's Office - Ham/IN
12                               5400 Federal Plaza, Suite 1500
                                 Hammond, Indiana 46320
13                               219-937-5500
                                 Fax: 219-852-2770
14

15    FOR THE DEFENDANT:         ADAM TAVITAS
                                 Law Office of Adam Tavitas
16                               751 East Porter Avenue, Suite 3
                                 Chesterton, Indiana 46304
17                               219-677-9220
                                 Fax: 219-972-7110
18                               Email: Adtavitas@aol.com

19    ALSO PRESENT:              Defendant, Lorenzo Johnson

20

21

22

23

24

25    Transcript produced from electronic media.
</pre>

1      (The following proceedings, transcribed from electronic

2      media, commenced at 3:29 p.m., as follows:)

3          **COURTROOM DEPUTY:**  This is the case of the United

4  States vs. Lorenzo Johnson, 2:20-cr-7.

5      On behalf of the Government, we have AUSA Jill Koster by

6  telephone.  Present on behalf of the Defendant, Lorenzo

7  Johnson, who is appearing by video from Porter County Jail, is

8  Attorney Adam Tavitas.  We're on the record.

9          **THE COURT:**  All right.  Thank you, Sue.

10  Good afternoon, Ms. Koster.

11          **MS. KOSTER:**  Good afternoon, Judge.

12          **THE COURT:**  Good afternoon, Mr. Tavitas.

13          **MR. TAVITAS:**  Good afternoon, Your Honor.

14          **THE COURT:**  And we're here.  There were a couple of

15  letters that were filed by Mr. Johnson, and I struck the first

16  one, and I'm going to strike the second one, so the docket

17  entry will indicate that all letters that have been filed that

18  -- are stricken.

19      And, Mr. Tavitas, have you had an opportunity to talk to

20  Mr. Johnson?

21          **MR. TAVITAS:**  I have, Your Honor.  I met with

22  Mr. Johnson yesterday as well as while we were waiting for this

23  to begin.  Had good conversations.

24      There's probably on my part a miscommunication of

25  Mr. Johnson.  I thought he was hiring private counsel.  I had a

1  couple different lawyers reach out to me, and so I thought he

2  was going to have private counsel, but he has not.

3      I told Mr. Johnson of today's hearing and why we're having

4  a hearing and that, if he wishes me to continue on with his

5  case, I told him -- I told Lorenzo that I would like to stay on

6  and help him as best I can.  I did tell him, though, that I

7  have a murder trial next week in Crown Point; and then once

8  that's over, then I'll be able to go see him again.

9      I believe, Your Honor, Mr. Johnson and I are on good terms

10  right now, and I believe Mr. Johnson would still like me to

11  represent him; but, obviously, I think he needs to tell the

12  Court that, Your Honor.

13          **THE COURT:**  Well, at this point, Mr. Johnson, you

14  can't communicate directly with the Court.  You have to

15  communicate through counsel.

16      If you want Mr. Tavitas to withdraw, you have to talk to

17  him about that and direct him to file a motion to withdraw, and

18  in the same motion, he can ask that another lawyer be

19  appointed.

20      If you want him to remain as counsel, then he can remain

21  as counsel.

22      But you're not making that decision now anyway.  I want

23  counsel and Mr. Johnson to discuss representation, discuss the

24  case, and then make that decision.

25      Mr. Tavitas, if nothing needs to be filed, if you and

1    Mr. Johnson have reconciled or can reconcile your relations,

2    then nothing needs to be filed.

3         **MR. TAVITAS:**  Yes, Your Honor.

4         **THE COURT:**  But if Mr. Johnson wants you to withdraw

5    for any reason, then put that in a written motion.  Mr. Tavitas

6    will file it, and then I'll set that for a hearing, and then I

7    can make the decision at that point.

8         So I don't want to ask Mr. Johnson --

9         **MR. TAVITAS:**  Okay.

10        **THE COURT:**  -- now if he wants to keep Mr. Tavitas or

11   not.  That's not a decision that we're going to make.  I would

12   want a motion only to come from counsel.  And then we'll take a

13   look at it once we get that motion, if that's necessary.  Do

14   you understand --

15        **MR. TAVITAS:**  That's fine, Your Honor.

16        **THE COURT:**  -- where I'm --

17        Mr. Tavitas, is that fine?

18        **MR. TAVITAS:**  Yeah.  That's fine, Your Honor.  And,

19   like I said, I believe I've reconciled any differences with

20   Mr. Johnson and that I believe I'll still be in the case.  But,

21   again, once my trial ends next week, I'll go see Lorenzo the

22   following week to double-check to make certain that he wants me

23   as counsel.  If he says yes, then I won't file anything.  If he

24   says if he wants new counsel, then I will file the appropriate

25   paperwork.

1    **THE COURT:**  All right.

2    Mr. Johnson, you understand that you're not going to hear

3    from Mr. Tavitas next week; he's got another gentleman that

4    he's doing a large trial with.  Within two weeks, though, he

5    will be over to talk with you.  Okay, sir?

6    **THE DEFENDANT:**  Yes, sir.

7    **THE COURT:**  All right.  And then just correspond with

8    your lawyer.  Every time you correspond to the Court, it runs

9    the risk of things that the Government shouldn't know, the

10    Court shouldn't know, possibly getting on the docket, and that

11    we don't want that to happen.  The right to remain silent, I've

12    advised you of that on more than one occasion, I believe, and

13    you don't want something that you write to the Court to hurt

14    you in some way either with trial or sentencing or anything.

15    Ms. Koster does not need any further help in any case, and the

16    Courts don't need to hear anything else.  It should all come

17    from counsel.  People can get into trouble by filing direct

18    letters with the Court, and I hate to have something like that

19    happen, revealing some defense or revealing some issue with

20    your case that the Government would not have known or the Court

21    would not have known.  Okay, sir?

22    **THE DEFENDANT:**  Yes.

23    **THE COURT:**  Okay.  And if you need something, you can

24    just contact Mr. Tavitas's office, leave a message directing

25    him to get ahold of you if it's an emergency.  And Mr. Tavitas

1    is a very caring and experienced lawyer, and he'll do what's

2    best for you.

3         But if you and him have an irreconcilable difference for

4    whatever reason, bring it to the Court's attention now, and I

5    could address it, and I'll potentially appoint another lawyer

6    if it needs.  All right?

7              **THE DEFENDANT:**  Yes, sir.

8              **THE COURT:**  Okay.  Anything else, Mr. Tavitas?

9              **MR. TAVITAS:**  No, Your Honor.  Thank you very much.

10             **THE COURT:**  All right.

11        Ms. Koster, anything before I close the record?

12             **MS. KOSTER:**  No, Your Honor.

13             **THE COURT:**  All right.  Thank you.  Everyone have a

14   good day.  Be safe.

15        (Court adjourned at 3:35 p.m.)

16                    CERTIFICATE OF REPORTER

17             I, Angela Phipps, RMR, CRR, CSR, certify that the

18   foregoing is a true, complete, and accurate transcript of the

19   record of proceedings from electronic media in the

20   above-entitled matter before the Magistrate Judge John E.

21   Martin, on August 20, 2020.

22

23   Date:  April 25, 2022      S/Angela Phipps, RMR, CRR
                                Official Court Reporter
24                              for the U.S. District Court

25

1            UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF INDIANA
2                  HAMMOND DIVISION

3    UNITED STATES OF AMERICA,      )
                                    )
4      vs.                          )   Case No.
                                    )   2:20-cr-00007-PPS-JEM
5    LORENZO JOHNSON,               )
                                    )
6          Defendant.               )
     _____  )

7

8                  **SENTENCING HEARING**
                   **DECEMBER 17, 2021**
         **BEFORE THE HONORABLE PHILIP P. SIMON**
9              **UNITED STATES DISTRICT COURT**

10   <u>APPEARANCES:</u>

11   FOR THE GOVERNMENT:       EDUARDO A. PALOMO - AUSA
                               U.S. Department of Justice
12                             Criminal Division
                               1301 New York Avenue NW, Room 715
13                             Washington, DC 20530
                               202-579-5738
14                             Fax: 202-514-1793
                               Email: eduardo.palomo2@usdoj.gov
15

16                             MOLLY ANNE KELLEY - AUSA
                               U.S. Attorney's Office - Ham/IN
17                             5400 Federal Plaza, Suite 1500
                               Hammond, Indiana 46320
18                             219-937-5500
                               Fax: 219-852-2770
19                             Email: molly.kelley2@usdoj.gov

20

21   FOR THE DEFENDANT:        ADAM TAVITAS
                               Law Office of Adam Tavitas
22                             751 East Porter Avenue, Suite 3
                               Chesterton, Indiana 46304
23                             219-677-9220
                               Fax: 219-972-7110
24                             Email: Adtavitas@aol.com

25

---

```
 1              THE COURT:  I know you provided it, but for reasons

 2    with this COVID, and I have law clerks working at home, and

 3    that's not anybody's fault but it --

 4              MS. KELLEY:  It probably was --

 5         (Document tendered to the Court.)

 6              THE COURT:  No, that's fine.  I just want to be able

 7    to get exactly what the language is.  This was sent to me, but

 8    I failed to print it out.  So it's nobody's fault but my own,

 9    but I want to have the exact item of property so I can read it

10    into the record.

11         Okay.  Again, before we get to the objections, I wanted to

12    cover one other area.

13         On December the 3rd, the Government filed, frankly, an odd

14    motion.  It was seeking a protective order for something before

15    actually producing it to the Defense and providing it -- Well,

16    they provided it to the Court, but it was an ex parte request

17    for a protective order.  I wasn't comfortable with that kind of

18    procedure, so I simply ordered the production of the underlying

19    material that's laid out in Document No. 111, but also

20    immediately ordered its protection by virtue of a protective

21    order.  And I've been told that the Government has complied

22    with that request and the material was, in fact, disclosed to

23    Mr. Tavitas; again, the material contained in Document No. 111.

24         Is that true, Mr. Tavitas?

25              MR. TAVITAS:  It is true, Your Honor.  On
```

```
 1    December 6th, I received a letter from the Government

 2    regarding the specific -- the Giglio as far as -- in the

 3    protective order.  And this particular document, I was able to

 4    show it to Mr. Johnson.  We were actually at the Hammond Jail.

 5    There's a glass partition, but I was able to show him.  It's a

 6    two-page document, and I was able to show him both pages, and

 7    we were able to review it together.

 8         THE COURT:  And just without getting into the details

 9    of it because it's under seal, in a summary way, it deals with

10    potential Giglio material as it relates to two of the agents in

11    that case; is that right, Ms. Kelley, just for the record?

12         MS. KELLEY:  Yes.

13         THE COURT:  And, Mr. Tavitas, did you have a chance

14    to fully discuss this with your client and what, if anything,

15    you're going to do with it?

16         MR. TAVITAS:  I have, Your Honor.  Not only after

17    getting this produced.  I have -- I did have a discussion with

18    Mr. Johnson.  Also had a discussion with Mr. Johnson earlier

19    today, as well.  Based on this material, this disclosure,

20    Mr. Johnson wanted me to orally request a motion for a new

21    trial.

22       He believes that his trial -- he was prejudiced by not

23    having this information given to us prior to trial and that he

24    believes that the jury should have been aware of the contents

25    that's in the protective order.  And for that reason,
```

```
 1    Your Honor, we would orally move for a motion for a new trial

 2    in this matter.

 3          THE COURT:  This is different from what I was

 4    expecting, frankly.  I mean, if you want to file a motion for a

 5    new trial, file a motion for a new trial and support it with

 6    how you would have used it, how it would have been germane to

 7    something, you know, would it have been admissible, what's the

 8    law governing, et cetera.  Instead, you're simply making an

 9    oral motion that's not, sort of, necessarily well-supported.

10          I have no idea how this could have been used in a trial.

11    I haven't gone back -- Because there hasn't been a motion until

12    ten seconds ago, I haven't gone back and read the testimony of

13    Agent Robertson or Agent Oakes to see how this information

14    could have somehow been germane to impeaching them; did they

15    say something during their testimony that would have reasonably

16    raised this issue and allowed you to cross-examine on it, you

17    know.  Do you have anything more specific to say about it?

18          MR. TAVITAS:  I do not, Your Honor.

19          THE COURT:  Let me ask you, Ms. Kelley.  In

20    paragraph 2 of your motion, you say that the agents did not

21    disclose this information and what I -- There was some

22    ambiguity to that to me.  Was that saying they didn't disclose

23    the information, the subject information, during your interview

24    with them or during trial, while they testified?

25          MS. KELLEY:  In our motion we were referring to the
```

1   pretrial discussions with the agents.

2          **THE COURT:**  I see.  And so you had asked them during

3   your pretrial interview whether there was anything that would

4   undermine their objectivity in the case, essentially?

5          **MS. KELLEY:**  Yes, Your Honor.

6          **THE COURT:**  And they both said no?

7          **MS. KELLEY:**  That's correct, Your Honor.

8          **THE COURT:**  And possibly this information that they

9   didn't disclose could bear on that; that's the reason you've

10  disclosed this?

11         **MS. KELLEY:**  Yes.  Essentially.  Yes, Your Honor.

12         **THE COURT:**  I guess, Mr. Tavitas, how would you have

13  used this at trial?  I want to make a record here.  If we're

14  going to do this, we're going to do it.  Otherwise, I'm going

15  to suspend the hearing and force you to file a motion instead

16  of just dumping this in my lap and expecting me to make some

17  ruling by the seat of my pants.

18         **MR. TAVITAS:**  I understand, Your Honor.

19         **THE COURT:**  That's not how it works, and it's a

20  little unfair to the Court.

21         **MR. TAVITAS:**  I understand that, Your Honor, and I do

22  apologize.  I did go over, when I did get this letter, and I

23  showed it to Mr. Johnson, and I indicated that I had gone over

24  with the transcripts, and I gave my opinion to Mr. Johnson as

25  if -- if this information had been disclosed and if it would

```
 1  have been potentially allowed at trial.  I gave Mr. Johnson
 2  that particular opinion.  But even after giving that opinion,
 3  again, Mr. Johnson this morning asked -- was asking me to
 4  orally make that request that I made.  So, again, I do
 5  apologize to the Court.
 6         THE COURT:  All right.  I don't know what else to say
 7  other than to say I deny the motion for a new trial based upon
 8  its barebones nature.  It's not well-conceived.  It hasn't been
 9  explained to me.  I haven't been shown how this information
10  would have been used.  The information seems entirely
11  irrelevant to anything that took place during this trial as far
12  as I can tell, and I can conceive of no way it would have been
13  used by the Defense during the course of the trial, whether
14  that be in general or, in particular, cross-examination of
15  either of these witnesses; and in the absence of a more
16  particular motion telling me why what I just said is incorrect,
17  the motion is denied.
18      Is there anything else to say about that?
19         MR. PALOMO:  Not about that, Your Honor.  I did
20  neglect earlier to discuss restitution.
21      We have received restitution requests from the victims,
22  but we have not yet received materials supporting those
23  requests.
24         THE COURT:  Okay.
25         MR. PALOMO:  And we would ask the Court to delay a
```

```
 1   his history, the Court should apply that enhancement,
 2   Your Honor.
 3        THE COURT:  I'm not minimizing it in the least.  What
 4   I'm saying is that, as far as calculating where he falls in the
 5   guidelines, whether this applies or not, he's going to be a
 6   Level 43; is that correct?
 7        MR. PALOMO:  That's correct, Your Honor.
 8        THE COURT:  I do overrule the objection.  I do think,
 9   notwithstanding what I have just said, I do think that 4B1.5(b)
10   does apply; and the five-level enhancement is applicable for
11   the reasons stated in the Government's response, on pages 2
12   and 3 of the Addendum, that by virtue of the Defendant's prior
13   conviction as well as the conviction in this case of the three
14   co-conspirators in the production of child pornography as it
15   relates to those, that, combined, it does amount to a pattern
16   of activity involving prohibited sexual conduct.  And,
17   therefore, 4B1.5(b) applies; and the objection is, therefore,
18   overruled.
19      Okay.  Anything else that I need to resolve as it relates
20   to the objections, Mr. Tavitas?
21        MR. TAVITAS:  No, Your Honor.
22        THE COURT:  All right.  How about you, Mr. Palomo?
23        MR. PALOMO:  No, Your Honor.
24        THE COURT:  All right.  I do now adopt the factual
25   statements contained in the Presentence Report as my own
```

```
 1    findings of fact, and I also adopt Probation's conclusions as
 2    to the applicable guidelines.
 3         And so I will state that the guidelines are as follows:
 4    There's a total offense level of 43.  The criminal history
 5    category is I.  And under the Guidelines, that suggests a life
 6    sentence as the recommended sentence.
 7         Supervised release is five years on Counts One through
 8    Three and Six, and it's one to three years on Count Seven.  The
 9    fine range is $50,000 to $250,000.  Restitution will be
10    determined at a later proceeding, or in a later proceeding.
11    And there is a $500 special assessment, $100 on each count,
12    that the Defendant is accountable for.
13         So based on all the rulings that I've made, is that all
14    accurate?
15         Mr. Tavitas?
16            MR. TAVITAS:  It is, Your Honor.
17            THE COURT:  Mr. Palomo?
18            MR. PALOMO:  That's correct, Your Honor.
19            THE COURT:  Okay.  All right.  So, Mr. Tavitas, as
20    the lawyer for the Defendant, is there anything that you wish
21    to say on his behalf before I sentence him?
22            MR. TAVITAS:  Your Honor, these are tough situations
23    which obviously after, you know, going -- you know, going
24    through -- I think it was a four- or five-day trial and seeing
25    the evidence that was presented -- You know, I've been on this
```

```
 1    case for almost two years, and, you know, I've talked with
 2    Mr. Johnson often.  His mom and his sister are present.
 3    They're very nice individuals, Your Honor.  You know, I talked
 4    with them before trial and even after trial.  So I know
 5    Mr. Johnson -- I know he's very appreciative of them being
 6    here.  I know sometimes it's -- it's a pretty lonely -- I can
 7    only imagine, lonely feeling sometimes having clients -- when
 8    you're facing a sentence, especially a significant sentence,
 9    and being all by yourself.  And so I do know that he is
10    appreciative of them being here.
11         Your Honor, obviously, you know, in these types of cases,
12    you know, the guidelines go through the roof, right?
13    Mr. Johnson is looking at a potential life sentence.  He
14    obviously has a mandatory minimum of 25 years, and that's what
15    we're asking the Court to sentence him.
16         He's 33 years old.  Does have six dependents.  He has been
17    incarcerated two years on this particular matter.  As you did
18    indicate, he does have a criminal history score of I.
19         So for all those reasons, Your Honor, we're asking the
20    Court to sentence him to the least amount of time, and that's
21    being 25 years.
22         One other request, Your Honor, is that his sister had
23    indicated that, in speaking with Mr. Johnson, asking to make a
24    recommendation to the BOP.  There's a facility called Sandstone
25    in Minnesota.  I did advise Mr. Johnson the Court will
```

1    obviously just make the recommendation and it's up to the
2    Bureau of Prisons to decide.  But that is where he indicated
3    where he wanted to be placed, as well as obviously get the
4    credit for time he's been incarcerated since this case was
5    filed.
6        Thank you.
7            **THE COURT:**  Okay.  Thank you, Mr. Tavitas.
8        Mr. Johnson, do you wish to say anything on your own
9    behalf, sir, before I sentence you?
10           **THE DEFENDANT:**  Yes.
11           **THE COURT:**  Sure.
12           **THE DEFENDANT:**  I really wasn't going to say
13   anything, but I just wanted to -- I felt like I needed to speak
14   today because it's kind of -- I'm like a mute, kind of, without
15   addressing things.
16       But every night, like, I pray.  I ask for forgiveness
17   because I feel that I could have made better decisions and
18   choices to prohibit certain situations that happened with this
19   case.  I honestly just wanted to have a fair trial and a fair
20   chance and presenting, you know what I'm saying?
21       Not saying I'm a hundred percent innocent on everything.
22   But I just wanted to take responsibility for the things that I
23   did do, and I wanted to fight for innocence for the things I
24   felt I did not do and which I just feel it wasn't done.  But I
25   went through a jury, and I was found guilty through a jury.

Angela Phipps, RMR, CRR, CSR
(219) 852-3616 - Angela_Phipps@innd.uscourts.gov

```
 1        But, you know, I apologize for my actions for the things
 2   that I did, did, and I do take responsibility for those things,
 3   and it's unfortunately me being accused of the things I didn't
 4   do.  But we're not going to get into that because, you know,
 5   we're past it.
 6        But I do have children, you know, that depend on me.  And
 7   I also, you know -- you know, I love my children.  And even
 8   other children in my family and everything, I take pride into
 9   being that example for them.  And I would never intentionally
10   harm anyone, especially someone of the age of this case, and I
11   would never intentionally try to victimize anyone because
12   that's not my character, and it's never been my character.  I
13   do have a background of a felony from something that happened
14   when I was 19.  And it just kind of feel like that's what's
15   being held against me, from that mistake that I made then.  But
16   I am apologetic, and, you know, I feel horrible for the people
17   that was victimized in this situation.  And, like I said, I
18   wanted a chance to take responsibility for my doings and just
19   fight for the things that I didn't do.
20        THE COURT:  Okay.  I appreciate that.  Thank you,
21   Mr. Johnson.
22        Mr. Palomo, do you want to be heard, sir?
23        MR. PALOMO:  Yes, Your Honor.
24        Dominique Harper had children that depended on her, too.
25   Kelsie Gauler had children that depended on her.  Those
```

 1   children aren't going to have their parents anymore.

 2       In Dominique Harper's case, she'll get out of jail one

 3   day, return to her children's lives.  Kelsie Gauler won't.

 4       When Defendant sent a message to somebody that he had

 5   never met on Facebook saying, "Do you want to make $2,000," he

 6   did this with the intent of persuading these people, who had

 7   never met him once before, didn't even know that he existed,

 8   with the intention of having them produce child pornography,

 9   child pornography involving their own children.

10       So now John Doe Three gets to wake up this morning and get

11   ready for his day the way that other four-year-old children do.

12   He eats his breakfast, brushes his teeth.  But his mom is

13   sitting in jail today because this man persuaded her to do

14   something that wasn't actually in her nature.  She needed

15   money, and she made a terrible criminal choice to sexually

16   abuse her child at his direction.

17       Kelsie Gauler.  John Doe One and Two, her children, who

18   were four and six at the time of these offenses, now a couple

19   years older, they're getting ready to go to first and third

20   grades, packing their lunches, going to school like other kids,

21   except the difference is that they'll never see their mother

22   again.  On March 15th, she committed suicide, before this

23   trial.  And there are a lot of things that go into that.  But

24   he's to blame for part of it, because if she had never had this

25   man drop into her life, maybe she'd still be here today.  Maybe

1  her children would have a mother to call to help them get ready

2  in the morning for school.

3       That's why these crimes are serious.

4       This isn't a normal child pornography -- as if any child

5  pornography offense is normal.  This is a strange outlier.  Did

6  this man persuade these women to create these images for his

7  own sexual gratification?  The messages presented at trial show

8  that he did.  When he sends messages like, "Are you going to

9  jack it off or suck it," talking about John Doe One's penis, an

10 infant, why did he write that but for some purpose of sexual

11 gratification?  There was certainly an element of that in this

12 case.  But this is deeper, different, more sinister.

13      The reason he was trying to get these images from theses

14 women wasn't just because he got sexual gratification from

15 them; it was to blackmail them.  And this is the most

16 perplexing part.  For what?  Why do these crimes?  Why reach

17 out to these women and offer them $2,000 and then distribute

18 child pornography to them to normalize that criminal conduct so

19 that you can get images of their kids?  And for what?  So that

20 you can blackmail them, try to get money out of them, persuade

21 them to have sex with you?

22      These women's lives, these co-conspirators, and their

23 children, their lives are utterly ruined because of this.  The

24 seriousness of this offense is almost mind-boggling.

25      Now, in view of the guidelines, these guidelines

```
 1   accurately account --

 2           THE COURT:  Have those two moms been sentenced yet?

 3           MR. PALOMO:  Not yet, Your Honor.

 4           THE COURT:  What are they looking at?

 5           MR. PALOMO:  Dominique Harper pleaded guilty to

 6   transportation of child pornography without a plea agreement

 7   setting a range.  So her minimum is going to be five years with

 8   a maximum of 20.

 9       Jasmine Stanley's sentencing proceeding will happen on

10   December 21st, Your Honor.  She'll change her plea on

11   December 21st.  She's currently charged with one count of

12   production of child pornography.

13           THE COURT:  That's also in Chicago?

14           MR. PALOMO:  Yes, Your Honor.

15           THE COURT:  Such an odd case.  They're both victims

16   and co-conspirators.  It's really odd.

17           MR. PALOMO:  And the Government doesn't want to

18   minimize their role in this.  They produced these images.  They

19   are the hands-on abusers of these children.  They deserve to be

20   punished for their role in these crimes.  But the first mover,

21   the but-for cause here, is sitting in this courtroom (pointing

22   to Defendant).  If he would have been doing anything else,

23   bowling, managing his D.J. business or his entertainment

24   business, doing something else productive with his time, we

25   wouldn't be here today.  Potentially some of these children
```

1    would be spending time with their mothers now.

2        But we're not.  And if we view this in the context of, not

3    just the Sentencing Guidelines, which gives us a number that's,

4    frankly, really high -- It recommends a life sentence.  But the

5    reason that the Government is recommending 50 years is in view

6    of the 3553(a) factors.  The very serious and just perplexing

7    and -- It's so hard to wrap your head around why this man did

8    these things.  And then if you view that against the

9    unspeakable harm that he's caused through it, you're looking at

10   one of the more serious offenses that I can think of,

11   Your Honor.

12       Now, if you look at his history, there's really nothing in

13   his history that could even come close to mitigating this.  He

14   didn't have the same kind of privilege that other Defendants

15   may have or that other people in society might have, but his

16   childhood also wasn't riddled with the kind of abuse that would

17   potentially make him a little less culpable.  He went into this

18   with his eyes open.  He knew what he was doing, especially

19   because in 2008 he was convicted of a sex offense.  He had to

20   register as a sex offender; he had been through the system

21   before; and he knew he shouldn't be doing these things.

22       As the Court recalls from the evidence presented at trial,

23   some of his communications with his co-conspirators included

24   statements of, "You know how illegal this is.  I have buddies

25   on the force.  If we get caught doing this, we're in big

```
 1    trouble."  And that's precisely what he used as a threat
 2    against these other women.  "I'll expose you."  Expose you for
 3    what?  "Stuff that I know is illegal, not just illegal, but
 4    highly illegal.  If I expose you, your life is ruined."  Well,
 5    their lives were ruined anyway.
 6         That's why a 50-year sentence is appropriate here.  In
 7    view of his history and characteristics, anything less than a
 8    50-year sentence would be insufficient to address the
 9    seriousness of the conduct in view of his history.
10         And then you talk about rehabilitation, specific
11    deterrence, and just protecting the public from this man.
12         The public is not safe if he's not in jail.  If he's not
13    in prison, he'll find a way to victimize other people.  He
14    didn't just do it twice, in 2008 and then for these offenses.
15    He did it in 2008 and over a period of approximately
16    five months in 2019.  This was protracted, premeditated conduct
17    on his part to get these images from these women.
18         A sentence of 50 years is appropriate, Your Honor, and we
19    ask that you sentence him to that term of imprisonment,
20    followed by a lifetime of supervised release.
21              THE COURT:  Okay.  Thank you, Mr. Palomo.
22         All right.  Mr. Johnson, in this case, as in any case,
23    it's my obligation to try to weigh the aggravating and
24    mitigating circumstances and arrive at a fair sentence; and I
25    do that through a prism of various factors that I have to take
```

1    into account.

2        The starting place in any sentencing hearing is:  What do

3    the Sentencing Guidelines suggest.  You know, I start there,

4    and then I start looking at other factors as well that are just

5    as important as the Sentencing Guidelines.  And through that

6    process, the goal is to arrive at a sentence that is sufficient

7    but not greater than necessary to reflect all of the factors at

8    issue.

9        And so in addition to the Sentencing Guidelines, I have to

10   look at the nature and circumstances of the offense.

11   Obviously, I have to look at what you did that brought you

12   here, the conduct underlying the offense.  That's no surprise.

13   So that's one factor.

14       I have to also look at your personal history and

15   characteristics.  And so as I frequently put it, what I have to

16   do is sentence you both for what you've done, but also for who

17   you are as a person, speaking more broadly.  And who you are as

18   a person-- in other words, your personal history and

19   characteristics --captures a broad range of things.  It can be

20   your criminal history.  It can be your educational background,

21   your employment history, your drug and alcohol use, how you

22   were raised, your family circumstances, your children.  The

23   whole range of things goes in to deciding what are your

24   personal history and characteristics.

25       Of course, I have to, as Mr. Palomo kind of touched upon,

1  I have to, when I announce the sentence, hope that it reflects

2  the seriousness of the offense, that it will promote respect

3  for the law, provide just punishment, as well as deter criminal

4  activity.

5      Deterrence is an important factor.  I mean, some people

6  argue all the time about the usefulness of deterrence.  There's

7  both specific deterrence, trying to prevent you from committing

8  additional crime, but there's also the concept of general

9  deterrence, sending a message to the community about what can

10  happen if you engage in this kind of behavior; and hopefully,

11  it prevents, or deters, others from engaging in this kind of

12  behavior.  And there's other factors, as well.

13      The long and short of it is, this is much more of an art

14  than a science.  It's trying to weigh all of the factors in

15  arriving at a fair sentence.

16      So let's talk about -- First of all, the Guidelines

17  recommend a life sentence, and the Guidelines treat this about

18  as serious as a homicide.  And so I have to pay attention to

19  that and weigh that in my analysis.

20      When I move on to the 3553 factors, you know, the nature

21  of this offense, I scarcely know what to say, as Mr. Palomo

22  states.  I sat here during this trial, and I was mystified.  I

23  didn't understand, on any level, I didn't understand what your

24  motivation was.  You know, were you motivated in really getting

25  pictures, photographs, of very, very young children displayed

1   in a sexual way?  In part, yes.  I mean, there's a very

2   disturbing back-and-forth where one of these co-conspirators

3   sends a picture of their young girl, and they have their legs

4   spread, and the fingers are inserted in the girl's vagina, at

5   your behest.  So somewhere in play here is, perhaps, your

6   interest in that kind of imagery.

7       And yet, on the other hand, there's hints that what's

8   really going on here is that it's actually an extortion scheme,

9   that you are roping these women into engaging with you in this

10  way, sending you these illicit pictures, with the intention of

11  turning around and using it against them in some nefarious or

12  devious way to either get money from them or to extort sex out

13  of them.  It's all a little murky.

14      But it's so disturbing.  It's so disturbing.  Like I said,

15  I scarcely know what to say about it.

16      We're talking about infants in some respect here who are

17  being used as essentially props, or in one view of this,

18  they're sort of props for your gratification, or the other view

19  of it, they're like bait as part of this scheme.  No matter how

20  you look at it, it's just deeply disturbing, and no one could

21  sit through this trial and not come away with that conclusion.

22  It's very sad.

23      Who it's mostly sad for, of course, these children, for

24  starters.  As Mr. Palomo points out, two of these women,

25  because they made the really poor judgment of engaging with

1  you, are now convicted felons.  In all likelihood, they're

2  going to be sent to prison, they're going to be removed from

3  these children, and these children are going to be left to

4  wonder, you know, where's their mom.  And eventually, they're

5  going to find out, eventually, in the age of the internet, and

6  surely they're going to find out what happened here.  And I

7  can't imagine the lifelong kind of burden that that's going to

8  sort of place on their psyche; but to be sure, it will.  And

9  that's a tremendous burden that you've placed on the very

10  slender shoulders of very, very, very young people.

11      And then you talk about the women themselves.  As I said,

12  either because they were desperate or really, really foolish,

13  they engaged in this behavior using their own children or

14  people close to them and participated in this endeavor.  But in

15  all events, they're going to end up in prison.

16      Which brings us to Ms. Gauler.  Perhaps the biggest

17  tragedy of all.  She was a Codefendant in this case.  I think,

18  if I'm remembering correctly, she was set to go to trial, and

19  she was released on bond, you know, earlier in the case.  And

20  she took her own life.  And, surely, the burden of this case

21  and the publicity from the case and the other shame that she

22  likely endured for the behavior she engaged in surely played a

23  role in that.  No one could conclude otherwise.  And that's

24  just a tremendous tragedy.

25      So I don't think there's anything more I need to say about

 1   the nature and circumstances of the offense.  It's just about

 2   as bad as it gets.  Short of taking someone's life.  And in

 3   many ways, that's what the consequences of it was anyway with

 4   the result of Ms. Gauler's fate.  Of course, you didn't have

 5   any intention of that happening, and I'm not suggesting that,

 6   but that was the consequence of it.  So the nature of the

 7   offense could hardly get any more serious.

 8       When I talk about your personal history and

 9   characteristics, of course, you engaged in this terrible prior

10   offense back in 2008.  Evidently, you were working at a high

11   school and engaged the student and engaged in an aggravated

12   criminal abuse of her.  You pled guilty to it and, somewhat

13   unbelievably, received a sentence of probation, I believe, on

14   that prior.

15       That's pretty amazing.  Maybe there were circumstances

16   that I don't fully understand.  I'm not being critical.  I'm

17   just telling you my gut reaction to that.  It doesn't seem

18   right to me.  But it is what happened.  The facts are what they

19   are.  You pled guilty to an aggravated criminal sexual abuse,

20   and that's your background, or part of your background.

21       You have had a number of other -- I'll characterize as

22   very, sort of, minor brushes with the law that don't merit

23   discussion here and don't in any way aggravate the offense as I

24   see it.

25       You had a very tough upbringing.  I fully recognize that.

```
 1    I think, according to the Presentence Report, your dad is
 2    presently incarcerated, and your mom, who is here, suffers from
 3    a disability.  You were principally raised by your grandma, I
 4    believe, or grandparents out in Las Vegas.  But at some point
 5    they got just too old, and it became difficult for them, so you
 6    were shipped back here.
 7         And in the Presentence Report, this struck me very much;
 8    that, according to the Presentence Report, your grandma and
 9    grandpa must have done somewhat well for themselves.  They were
10    living in a nice environment in Las Vegas that you were living
11    in; but then when you came back here, given your mom's
12    difficult circumstances, you moved to Harvey, and it's a tough
13    environment.  And that juxtaposition kind of struck me, that
14    that would be a difficult thing for a young person to deal
15    with.  And so I recognize that, and I think it's an important
16    thing to talk about, your personal history and characteristics.
17         You do have six children, six children by five different
18    mothers; and, you know, that's certainly a factor that's
19    important in any case, as well as you do have some work
20    history.  It seems you found a way to support yourself despite
21    tough circumstances.
22         So I've done my level best to take into account all of the
23    factors here; and at the end of the day, I think the
24    Government's request is a reasonable one and is what's called
25    out for given all of the factors that I've talked about, and
```

1     that's the sentence I intend to give.

2         So let me formally announce it, and then I'll give counsel

3     one final chance to make any final comments or make any other

4     objections.

5         But it is the Judgment of the Court, pursuant to Title 18,

6     United States Code, Section 3551 and 3553, that the Defendant

7     is hereby committed to the custody of the Bureau of Prisons for

8     600 months on Counts One through Three, and 480 months on

9     Count Six, and 120 months on Count Seven.  All of those will

10    run concurrent with one another.

11        Defendant will be placed on 15 years of supervised release

12    for Counts One through Three; fifteen years on Count Six; and

13    three years on Count Seven, all to be served concurrent with

14    one another.

15        There will be a number of conditions of supervision that I

16    will talk about here in a minute but --

17        Well, let me just do it now, and let me ask you,

18    Mr. Tavitas.  Have you had a chance to sit down with your

19    client and thoroughly go over the proposed conditions of

20    supervision that are set out in the Presentence Report?  And in

21    the report, it states both the proposed terms and the reasoning

22    behind each of the proposed terms.  Have you had a chance to

23    sit down with your client and do that?

24            **MR. TAVITAS:**  We have, Your Honor.

25            **THE COURT:**  Ordinarily, I'm required to read these

```
 1   officially into the record; but with your permission, I would
 2   like to simply incorporate the language of each of these
 3   conditions from the report into my comments here today as well
 4   as the reasoning behind each one of these to, really, spare me
 5   having to officially read these into the record.  Do you have
 6   any objection to that procedure?
 7            MR. TAVITAS:  No, Your Honor.
 8            THE COURT:  Mr. Johnson, do you have any objection to
 9   that yourself?
10            THE DEFENDANT:  No.
11            THE COURT:  Okay.  All right.  So I will give the
12   four mandatory conditions -- well, actually the five mandatory
13   conditions, that are set out on page 24 of the Presentence
14   Report, Document No. 113.
15        As it relates to the discretionary conditions, I'll give
16   number one, number two.  We're now on page 25 of the report.
17   I'll give number 3, number 4, number 5, number 6, number 7,
18   number 8, number 9, number 10, number 11, number 14, number 15,
19   number 16, number 17, number 18, number 19, and number 20.
20        I will withstand at this point any of the conditions
21   relating to the restitution because we're delaying that issue.
22        I'm going to impose no fine given the Defendant's lack of
23   assets makes it unlikely he will be able to pay a fine.  So the
24   fine is waived.  But he is ordered to pay a special assessment
25   of $500 that's due immediately.
```

```
 1        The sentence that I've just given is actually below what
 2   the guidelines suggest.  I've given the sentence that I've just
 3   announced for all the reasons that I have tried to explain in
 4   detail on the record.
 5        Counsel, do either of you know of any reasons why the
 6   sentence should not be imposed as stated?
 7        Mr. Tavitas?
 8             MR. TAVITAS:  No, Your Honor.
 9             THE COURT:  All right.  Mr. Palomo?
10             MR. PALOMO:  No, Your Honor.
11             THE COURT:  I will state that, irrespective of
12   whether I have somehow miscalculated the guidelines or erred in
13   the computation of the guidelines in any way, the sentence that
14   I've just announced is the sentence that I would have given
15   notwithstanding that.
16        I can't remember if I just asked this.  Have I taken into
17   account your principal arguments in aggravation and mitigation
18   in my announcement here today?
19        Mr. Tavitas?
20             MR. TAVITAS:  You have, Your Honor.
21             THE COURT:  Mr. Palomo?
22             MR. PALOMO:  Yes, Your Honor.
23             THE COURT:  All right.  So I do order the sentence
24   imposed as stated.
25        Mr. Johnson, you've heard the Judgment of the Court
```

```
 1    imposing sentence upon you; and pursuant to Rule 32(j) of the
 2    Federal Rules of Criminal Procedure -- I did forget to include
 3    the forfeiture after all that discussion.  So let me also add
 4    to the Judgment that the following property is forfeited:
 5    Taurus PT140 G2 .40 caliber semiautomatic pistol with the
 6    serial number SKM35977, as well as assorted ammunition, as well
 7    as five cellular phones.  The first is a Samsung Galaxy J7 Star
 8    cellphone, Serial Number R58M50DJ1RL.  Samsung with the serial
 9    number J260T1.  An iPhone with serial number DNPYF1M2KXKP, an
10    LG LS777 phone, again, serial number 804CYLH1083072, and then a
11    Motorola XT1921-3 with the IMEI of 351841090366651.  So all of
12    that property is deemed forfeited essentially by agreement of
13    the parties.
14         All right.  Let me go back and just say, Mr. Johnson,
15    you've heard the Judgment of the Court imposing sentence upon
16    you; and pursuant to Rule 32(j) of the Federal Rules of
17    Criminal Procedure, you can appeal your conviction in this
18    case, and you also have a statutory right to appeal your
19    sentence under certain circumstances if you think it was
20    contrary to law.  Any notice of appeal must be filed within
21    14 days of the Judgment being entered in your case.  And if you
22    want to file the appeal but you're unable to pay for the cost
23    of the appeal, you may apply for leave to appeal in forma
24    pauperis, which means you can pursue an appeal at no cost
25    to you.
```

```
 1        And, of course, Mr. Tavitas, just perfect the appeal.  I'm
 2   sure your client will be seeking it, and do so expeditiously.
 3   You do remain responsible for the Defendant's representation on
 4   appeal unless you are relieved by the Court of Appeals.
 5        I will recommend that the Defendant serve his sentence in
 6   Sandstone up in Minnesota, and I also recommend, if he wants,
 7   participation in the RDAP program given his basic daily drug
 8   use, if you think that would be helpful, Mr. Tavitas?
 9        (Inaudible discussion off the record between Mr. Tavitas
10         and Defendant).
11            MR. TAVITAS:  He indicated that he did not want that,
12   Your Honor.
13            THE COURT:  Okay.  Fair enough.  I won't make that
14   recommendation.
15        All right.  Mr. Tavitas, is there anything else we need to
16   talk about today?
17            MR. TAVITAS:  No, Your Honor.  Thank you.
18            THE COURT:  Mr. Palomo, how about from your point of
19   view?
20            MR. PALOMO:  No, Your Honor.
21            THE COURT:  Okay.  Thank you all.  Good luck,
22   Mr. Johnson.
23        (Court was adjourned at 11:27 a.m.)
24
25
```

SA 33

```
 1                    CERTIFICATE OF REPORTER

 2            I, Angela Phipps, RMR, CRR, certify that the

 3     foregoing is a true, complete, and accurate transcript of

 4     proceedings in the above-entitled matter before the Honorable

 5     Philip P. Simon, on December 17, 2021.

 6

 7     Date:  January 11, 2022        S/Angela Phipps, RMR, CRR
                                      Official Court Reporter
 8                                    for the U.S. District Court

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>  **Plaintiff,**<br><br>  vs.<br><br>**LORENZO JOHNSON**<br><br>  **Defendant.** | **CASE NUMBER: 2:20CR7-001**<br>**USM Number: 18201-027**<br><br><br>**ADAM TAVITAS**<br>**DEFENDANT'S ATTORNEY** |

### JUDGMENT IN A CRIMINAL CASE

**THE DEFENDANT** was found guilty on count(s) 1,2,3,6 and 7 of the Indictment after a Jury Verdict on August 16 2021.

**ACCORDINGLY,** the court has adjudicated that the defendant is guilty of the following offense(s):

| Title, Section & Nature of Offense | Date Offense Ended | Count Number(s) |
|---|---|---|
| 18:2251(a) and (e) CONSPIRACY TO PRODUCE CHILD PORNOGRAPHY | 10/19/2019 | 1 |
| 18:2251(a) and (e) CONSPIRACY TO PRODUCE CHILD PORNOGRAPHY | 10/16/2019 | 2 |
| 18:2251(a) and (e) CONSPIRACY TO PRODUCE CHILD PORNOGRAPHY | 9/3/2019 | 3 |
| 18:2252(a)(2) and (b)(1) DISTRIBUTION OF CHILD PORNOGRAPHY | 12/17/2019 | 6 |
| 18:922(g)(1) FELON IN POSSESSION OF A FIREARM | 12/17/2019 | 7 |

The defendant is sentenced as provided in pages 3 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

Final order of Forfeiture Forthcoming

**IT IS ORDERED** that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States Attorney of any material change in economic circumstances.

| | |
|---|---|
| December 17, 2021 | |
| Date of Imposition of Judgment | |
| s/ Philip P. Simon | |
| Signature of Judge | |
| Philip P. Simon, United States District Judge | |
| Name and Title of Judge | |
| December 17, 2021 | |
| Date | |

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **600 months for Counts 1-3, 480 months imprisonment for Count 6, and 120 months imprisonment for Count 7, all to be served concurrently**

The Court makes the following recommendations to the Bureau of Prisons:

1.  The Defendant be given credit for time served while awaiting sentence in this case.

2.  The Defendant be place at FCI Sandstone, Minnesota.

The defendant is remanded to the custody of the United States Marshal.

# RETURN

I have executed this judgment as follows:

      Defendant delivered _____ to _____ at _____, with a certified copy of this judgment.

_____
            UNITED STATES MARSHAL

By: _____
      DEPUTY UNITED STATES MARSHAL

USDC IN/ND case 2:20-cr-00007-PPS-JEM   document 122   filed 12/17/21   page 4 of 8
Case Number: 2:20CR7-001
Defendant: LORENZO JOHNSON

Page 4 of 8

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **15 years for Counts 1-3, 15 years  for Count 6, and 3 years for Count 7, to be served concurrently.**

Within 72 hours of the judgment or after the defendant's release from the custody of the Bureau of Prisons, defendant shall report in person to the nearest United States Probation Office for this district between the hours of 8:00 a.m. and 4:30 p.m.  While the defendant is on supervision pursuant to this judgment, the defendant shall comply with the following conditions:

## MANDATORY CONDITIONS OF SUPERVISION

1. Defendant shall not commit another federal, state or local crime.

2. Defendant shall not unlawfully use, possess, or distribute a controlled substance.

3. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic tests thereafter for use of a controlled substance.

4. Defendant shall cooperate in the collection of DNA as directed by the probation officer.

5. The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq), as directed by the probation officer, the Bureau of Prisons, and any state sex offender registration agency in which he resides, works, or is a student, or was convicted of a qualifying offense.

## DISCRETIONARY CONDITIONS OF SUPERVISION

While on supervision, the defendant shall comply with the following discretionary conditions:

1. The defendant shall not knowingly leave the federal judicial district without the permission of the court or probation officer. The probation office will provide a map or verbally describe the boundaries of the federal judicial district at the start of supervision.

2. The defendant shall report in person to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons. Thereafter, the defendant shall report to the probation officer in the manner and as frequently as reasonably directed by the court or probation officer during normal business hours.

3. The defendant shall not knowingly answer falsely any inquiries by the probation officer. However, the defendant may refuse to answer any question if the defendant believes that a truthful answer may incriminate him.

4.     The defendant shall follow the instructions of the probation officer as they relate to the conditions as imposed by the court. The defendant may petition the Court to seek relief or clarification regarding a condition if he believes it is unreasonable.

5.     The defendant shall make reasonable effort to obtain and maintain employment at a lawful occupation unless he is excused by the probation officer for schooling, training, or other acceptable reasons such as child care, elder care, disability, age or serious health condition.

6.     The defendant shall notify the probation officer at least ten days prior to any change in residence or any time the defendant leaves a job or accepts a job.  In the event that a defendant is involuntarily terminated from employment or evicted from a residence, the offender must notify the Probation Officer within forty-eight (48) hours.

7.     The defendant shall not knowingly and intentionally be in the presence of anyone who is illegally selling, using or distributing a controlled substance and if such activity commences when he is present, the defendant must immediately leave the location.

8.     The defendant shall not meet, communicate, or otherwise interact with a person whom he knows to be engaged or planning to be engaged in criminal activity.

9.     The defendant shall permit a probation officer to visit him at any time at home or any other reasonable location between the hours of 8:00 a.m. and 10:00 p.m. and shall permit confiscation of any contraband observed in plain view by the probation officer.

10.    The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.

11.    The defendant shall not enter into any agreement to act as an informant for a law enforcement agency without the permission of the court.

12.    The defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapon.

13.    The defendant shall participate in a program approved by the United States Probation Office for substance abuse, which may include testing for the detection of alcohol, controlled substances, or illegal mood-altering substance, if necessary after evaluation at the time of release. The defendant shall pay all or part of the costs for participation in the ordered program not to exceed his ability to pay for it. Failure to pay due to financial inability to pay shall not be grounds for revocation.

14.    The defendant shall participate in a mental health program approved by the United States Probation Office, if necessary after evaluation at the time of release. The defendant shall pay all or part of the costs for participation in the ordered program not to exceed **his/her** ability to pay for it. Failure to pay due to financial inability to pay shall not be grounds for revocation.

**Conditions relating to sex offenders**

15.    The defendant shall, if required to register under the Sex Offender Registration and Notification Act, submit **his/her** person, and any property, house, residence, vehicle,

papers, computer, other electronic communication or data storage devices or media, and effects to search at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the person, and by any probation officer in the lawful discharge of the officer's supervision functions.

16.     Defendant shall not knowingly and intentionally: (1) go to places where **children/boys/girls** under the age of 18 congregate; or (2) associate or have verbal, written, telephonic, or electronic communication with any **children/boys/girls** under the age of 18 without the prior permission of the probation officer. This condition does not encompass **children/boys/girls** under the age of 18 with whom defendant must deal to obtain ordinary and usual commercial services.

17.     The defendant shall participate in a program approved by the United States Probation Office for the treatment and monitoring of sex offenders. This may include sex-offender group and/or individual counseling. The defendant shall comply with all of the requirements and restrictions of that program and pay the costs associated with this rehabilitative program if financially able to do so. Failure to pay due to financial inability to pay shall not be grounds for revocation.

18.     Defendant must allow the probation officer, or designee, to install computer monitoring software on any computer (as defined in 18 U.S.C. 1030(e)(1)) and cell phone he uses. The Defendant must pay the cost of the monitoring software and installation, if financially able to do so, at the monthly contractual rate.

        Based on a thorough review of the defendant's financial condition as detailed in the presentence report, the Court finds that the defendant does not have the ability to pay a fine. The Court will waive the fine in this case.

        The defendant shall pay to the United States a total special assessment of $500, which shall be due immediately. (18 U.S.C. §§ 3013.)

USDC IN/ND case 2:20-cr-00007-PPS-JEM document 122 filed 12/17/21 page 7 of 8
Case Number: 2:20CR7-001
Defendant: LORENZO JOHNSON

Page 7 of 8

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth in this judgment.

| Total Assessment | Total Fine | Total Restitution |
|---|---|---|
| $500 | NONE | NONE |

The defendant shall make the special assessment payment payable to Clerk, U.S. District Court, 5400 Federal Plaza, Suite 2300, Hammond, IN 46320. The special assessment payment shall be due immediately.

## FINE

No fine imposed.

## FORFEITURE

The defendant is ORDERED to forfeit to the United States any interest the defendant may have in

- Taurus PT140 G2 .40 caliber semi-automatic pistol SN# SKM35977
- All assorted ammunition
- Samsung Galaxy J7 Star Cell Phone SN# R58M50DJ1RL
- Samsung, SM-J260T1 (no serial number; FBI Item 6)
- iPhone, Serial Number: DNPYF1M2KXKP
- LG LS777, serial number 804CYLH1083072
- Motorola XT1921-3, IMEI 351841090366651

USDC IN/ND case 2:20-cr-00007-PPS-JEM document 122 filed 12/17/21 page 8 of 8
Case Number: 2:20CR7-001
Defendant: LORENZO JOHNSON

Page 8 of 8

Name:<u>LORENZO JOHNSON</u>
Docket No.:<u>2:20CR7-001</u>

## ACKNOWLEDGMENT OF SUPERVISION CONDITIONS

Upon a finding of a violation of probation or supervised release, I understand that the Court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

I have reviewed the Judgment and Commitment Order in my case and the supervision conditions therein.  These conditions have been read to me.  I fully understand the conditions and have been provided a copy of them.

(Signed)

_____    _____
Defendant                                              Date


_____    _____
U.S. Probation Officer/Designated Witness          Date